**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

THOMAS LEO SPRINGS                                                    PETITIONER

v.                                        No. 5:13CV00005 JLH

RAY HOBBS, Director,
Arkansas Department of Correction                                    RESPONDENT

<u>**OPINION AND ORDER**</u>

Thomas Leo Springs was convicted of capital murder in the Circuit Court of Sebastian

County, Arkansas, and was sentenced to death.[1]  The victim was his estranged wife, Christina

Springs.  Springs' conviction and sentence were affirmed on direct appeal, and his post-conviction

motion for relief pursuant to Arkansas Rule of Criminal Procedure 37 was denied by the circuit court

and the Arkansas Supreme Court.

Springs has now filed a 156-page petition in this Court seeking habeas relief pursuant to

28 U.S.C. § 2254.  Springs' petition is a mixed petition, meaning that some of his claims have been

presented to the state courts, while others have not.  He argues, in part, that he is actually innocent

of capital murder by virtue of his mental condition.  Pursuant to the avoidance principle articulated

in *Dretke v. Haley*, 541 U.S. 386, 393-94, 124 S. Ct. 1847, 1852, 158 L. Ed. 2d 659 (2004), the

Court directed the parties to identify the claims that are not procedurally defaulted and argue the

merits of those claims, and then to identify the claims that are procedurally defaulted but for which

there are grounds to excuse the procedural default, arguing those grounds (other than actual

innocence), as well as the merits of those claims.  *See* Document #12.  The Court has received briefs

on these issues and will now address them.

---

[1] Springs also was convicted of two counts of aggravated assault, with each count resulting
in a sentence of six years imprisonment and a fine of $10,000.

## I. FACTS PROVEN AT TRIAL

Thomas and Christina[2] were together some twenty years.  Their relationship produced six children.  Thomas is black, whereas Christina was white.  Despite its longevity, their relationship was not always peaceful.  There was evidence at trial that Thomas had stated on numerous occasions that if Christina ever left him, he would kill her.

Christina left Thomas on December 14, 2004.  She and the five younger children stayed for approximately a week in a private residence before moving into a crisis center in their home town, Fort Smith, Arkansas, on December 21.  After Thomas began circling the crisis center, Christina and the children were moved to a crisis center in Tulsa, Oklahoma, where they stayed until approximately January 18, 2005, when they returned to the crisis center in Fort Smith so Christina could attend a proceeding relating to the divorce from Thomas and the children could return to school.

On the morning of January 21, 2005, Christina was a passenger in a vehicle driven by her sister, Kelly Repking.  Kelly's three-year-old daughter, Paige, also was a passenger in the vehicle. The three of them drove to the Sutton School in Fort Smith, where some of the children attended, and spoke with a policeman outside the school building regarding a report concerning Thomas's behavior at that school.  While they were at the school speaking to the policeman, Thomas was across the street yelling obscenities at Christina.

When the conversation with the policeman concluded, Kelly, Christina, and Paige left in Kelly's vehicle.  The policeman followed them for a time but then turned off.  Kelly, Christina, and Paige traveled down Greenwood Avenue to the intersection with Rogers Avenue, which is one of

---

[2] Because the petitioner and the victim share a surname, they will be identified by their given names in this statement of facts proven at trial.

the busiest intersections in Fort Smith.  At approximately 9:00 a.m., they stopped at the traffic light

at the intersection of Greenwood and Rogers.  While they were waiting for the light to turn, Thomas

arrived at the same intersection, traveling on Rogers Avenue.  After looking both ways, Thomas

made a right-hand turn from a left lane from Rogers onto Greenwood and deliberately rammed his

vehicle head-on into the vehicle that contained Christina, Kelly, and Paige.  He then exited the

vehicle, smashed in the passenger-side window next to Christina, and repeatedly bashed her face

into the dashboard.  After bashing Christina's head against the dashboard several times, Thomas

returned to his vehicle and retrieved a knife, which he used to stab Christina numerous times.

Christina died as a result of the injuries suffered during this attack.  The autopsy report concludes

as follows:

> This 41-year-old white female, Christina Springs, died of multiple stab and
> cutting wounds of the back (9), right side of the chest (4), left side of the chest (2),
> right lower extremity (3), left lower extremity (1), left upper extremity (4), and right
> upper extremity (1).  Investigation of the circumstances of death revealed that the
> decedent was reportedly stabbed in her vehicle.  She was transported to a local
> hospital where she was pronounced dead.
>
> Autopsy demonstrating multiple stab and cutting wounds involving the torso
> and extremities.  These wounds involved vital organ and blood vessels which
> resulted in internal bleeding.  Multiple defense type wounds were present on the
> upper and lower extremities.  Blunt force trauma consisted of facial contusions and
> superficial lacerations.

Not only had Thomas threatened to kill Christina should she ever leave him, he also had

repeated that threat to several persons after she left him.  One witness testified that on the morning

before the murder Thomas stated that he intended to kill Christina.

It was undisputed at trial that Thomas killed Christina in the manner described above.  At

the guilt phase, the defense primarily was that Thomas did not act with premeditation and

deliberation, as required for a conviction for capital murder.  The trial court instructed the jury on

capital murder and on the lesser offenses of first- and second-degree murder.  The trial court declined a request by the defense to instruct on manslaughter.  The jury found Thomas guilty of capital murder.

At the penalty phase, the jury unanimously found as aggravating circumstances that Thomas previously committed another felony an element of which was the use or the threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person;[3] that in the commission of the capital murder Thomas knowingly created a great risk of death to a person other than the victim; and that the capital murder was committed in an especially cruel or depraved manner.  As mitigating circumstances, one or more jurors found that the capital murder was committed while Thomas was under extreme mental or emotional disturbance, that he was acting under unusual pressure or influences or under the domination of another person, that Thomas's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, and that Thomas had six children, at least one of whom had expressed a wish to get an answer as to why his father killed his mother when he grows up.  The jury found, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances and justified a sentence of death.

## II. Procedural History

Springs was represented at trial by the Sebastian County Public Defender, John Joplin, and his deputy, Cash Haaser.  Joplin had participated in one prior capital case, Haaser in none.  Before trial, Joplin and Haaser sought and obtained an order directing that Thomas be examined psychiatrically.  An order was sent to the Arkansas Department of Human Services, Division of

---

[3] Thomas had three prior convictions for battery in the second degree in violation of Arkansas Code Annotated § 5-13-202, a Class D felony.

Mental Health Services, which forwarded the order and case file to a private psychologist, Paul Deyoub, Ph.D.  Dr. Deyoub submitted a forensic evaluation report in which he opined that Springs had the capacity to understand the proceedings against him and to assist effectively in his own defense, that he did not have a mental disease or defect, and that he had the capacity to conform his conduct to the requirements of the law.  Dr. Deyoub reported that Springs had average intelligence and "[t]here may have been anger, rage, and yet there was no mental disease or defect which would have affected his ability to appreciate the criminality of his conduct."  Springs' lawyers did not, after receiving Dr. Deyoub's report, pursue the issues regarding his mental condition, except in the penalty phase of the trial, when they introduced medical records showing that he had twice sought treatment for depression after Christina left – once on December 16, 2004, and again on January 2, 2005.

On direct appeal, Springs was represented by W.H. Taylor, Steve Vowell, Tonya L. Patrick, and Margie Alsbrook.  The Arkansas Supreme Court considered and rejected these claims of error:

1.      the trial court erred as a matter of law by failing to intervene and appoint a head-injury expert to examine Springs;

2.      the trial court erred by submitting aggravating circumstances to the jury that were not warranted by the evidence;

3.      the trial court erred by refusing to give Springs' proffered jury instruction on mitigating circumstances and, instead, submitting Arkansas Model Criminal Instruction Form 2;

4.      the trial court erred by admitting State's Exhibits 23 and 24, photographs of the victim at the hospital;

5.      the trial court erred by allowing Springs to be charged with capital murder because the death penalty is unconstitutional; and

6.      the trial court abused its discretion by admitting victim-impact evidence during the sentencing phase because, under Arkansas law, such evidence is irrelevant in capital murder cases.

*Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006) (*Springs I*).

Springs sought post-conviction relief under Arkansas Rule of Criminal Procedure 37 and was represented by Jeff Rosenzweig, a lawyer with considerable experience in death penalty cases.[4] The Rule 37 petition raised the following points:

1.      Springs' trial lawyers were ineffective in failing to establish that there was an organic or physical basis for Springs' actions. This failure prejudiced him in both the guilt and penalty phases.

2.      Springs' trial lawyers were ineffective in failing to conduct proper voir dire on the issue of the interracial aspects of the case.

3.      Springs' trial lawyers were ineffective in failing to call other mitigation witnesses.

4.      Springs' trial lawyers were ineffective in failing to object to the presentation of allegations that Springs had threatened to "cut" a jailer.

5.      The prosecuting attorney made closing argument misrepresenting mitigation, in violation of the Eighth and Fourteenth Amendments, and Springs' trial lawyers were ineffective in not objecting to the argument.

6.      Springs' trial lawyers were ineffective in failing to object to introduction of written victim-impact statements.

7.      Springs' purported waiver of the right to present evidence about the deceased was not knowing and intelligent. By not properly explaining it to him, Springs' trial lawyers rendered ineffective assistance.

Although Rosenzweig sought and obtained orders authorizing funds to hire a psychiatrist, a neurologist, and a neuropsychologist, and although he once wrote the court stating that these

---

[4] Arkansas Rule of Criminal Procedure 37.5(c) establishes standards that lawyers must meet to be appointed to represent a person under sentence of death in a Rule 37 proceeding. These standards are designed to ensure that lawyers appointed in Rule 37 proceedings to represent persons under sentence of death have sufficient training and experience to provide effective representation.

experts had completed their work, the first point was abandoned.  During the Rule 37 hearing, Rosenzweig told the court, "After certain testing was done, we are not pursuing [Point 1 in the Rule 37 petition]."  No issue regarding Springs' mental condition was adjudicated during the Rule 37 proceedings.

The Sebastian County Circuit Court denied the Rule 37 petition, and the Supreme Court of Arkansas affirmed.  *Springs v. State*, 2012 Ark. 87, 387 S.W.3d 143 (*Springs II*).  The Supreme Court of Arkansas considered and rejected these claims of ineffective assistance of counsel:

1.    trial counsel failed to investigate and call Springs' son, Matthew Mooring, as a mitigation witness;

2.    trial counsel failed to object to the prosecutor's closing statements that were misleading on the issue of mitigation evidence;

3.    trial counsel failed to object or seek instruction on a prior felony as an aggravating circumstance;

4.    trial counsel failed to object to the introduction of written victim-impact statements;

5.    trial counsel failed to conduct voir dire properly on the issue of racial bias; and

6.    trial counsel failed to explain to Springs the implications of waiving the right to present mitigation evidence about the deceased.

Springs sought a writ of certiorari from the Supreme Court of the United States, which was denied on October 29, 2012.  *Springs v. Arkansas*, 133 S. Ct. 528 (2012).  Springs then filed the current petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He seeks relief on the following grounds[5]:

Claim 1.    Thomas Springs' convictions and sentences should be vacated because he was severely mentally ill at the time of the crime, trial and throughout state post-conviction proceedings.

---

[5] The following outline is taken verbatim from the section 2254 petition.

Issue 1-1          Mr. Springs was not competent to stand trial.

      Point 1-1-1          Counsel was ineffective for failing to move for a hearing on competency.

      Point 1-1-2          Counsel was ineffective for failing to object to the violation of the court's order regarding the psychological evaluation.

      Point 1-1-3          Counsel was ineffective for failing to hire an independent psychological examiner.

      Point 1-1-4          Trial counsel erred in failing to renew its motion for appointment of an expert to examine Mr. Springs for brain injury.

      Point 1-1-5          Trial court erred in failing to sua sponte appoint a head injury expert.

      Point 1-1-6          Counsel was ineffective for failing to provide the court appointed examiner with relevant information regarding Mr. Springs.

      Point 1-1-7          Counsel was ineffective for failing to introduce expert testimony to explain the cause of Mr. Springs' bizarre behavior during trial.

      Point 1-1-8          The trial court erred in failing to order a competency hearing.

      Point 1-1-9          Mr. Springs' incompetency interfered with his right to be present.

      Point 1-1-10          Mr. Springs was declared competent as a result of prosecutorial misconduct.

Issue 1-2          Mr. Springs was denied his constitutional right to counsel because he was unable to communicate with counsel due to his mental illness.

Issue 1-3          Mr. Springs made waivers of important rights that were not knowing and intelligent.

Point 1-3-1     The trial court accepted a waiver of a colorable *Batson* challenge by Mr. Springs.

Point 1-3-2     The trial court accepted a waiver of evidence at the penalty phase.

Issue 1-4     Mr. Springs is actually innocent because his severe mental illness precluded him from forming the mental states for the crimes for which he was convicted.

Issue 1-5     Mr. Springs is actually innocent because he was legally insane at the time of the offenses.

Issue 1-6     Mr. Springs is actually innocent of the death penalty because his mental illness prevented him from forming the mental state necessary for two of the three aggravating circumstances.

Issue 1-7     Mr. Springs is actually innocent of the death penalty because no reasonable jury informed of his mental illness would have found the death penalty an appropriate punishment.

Issue 1-8     Mr. Springs' mental illness rendered him incompetent in posttrial and postconviction proceedings.

Issue 1-9     Counsel was ineffective for failing to raise the issue of Mr. Springs' competency in posttrial and postconviction proceedings.

Point 1-9-1     Posttrial period.

Point 1-9-2     Direct appeal.

Point 1-9-3     Rule 37 proceeding.

Issue 1-10     Rule 37 counsel was ineffective for failing to pursue a claim that Mr. Springs' criminal conduct was the result of a mental disease or defect.

Issue 1-11     Mr. Springs is ineligible for execution because of his mental impairments and his execution would violate the federal Constitution.

Issue 1-12    Mr. Springs' death sentence is unlawful because customary international law binding on the United States bars imposition of the death penalty on mentally disordered individuals.

Claim 2.    Mr. Springs received ineffective assistance of counsel at trial.

Issue 2-1    Failure to protect Mr. Springs' rights to a fair and impartial jury.

Point 2-1-1    Failure to support change-of-venue motion with additional, readily-available evidence.

Point 2-1-2    Failure to adequately question jurors about their exposure to prejudicial pre-trial publicity.

Point 2-1-3    Failure to object to excusing qualified jurors.

Point 2-1-4    Ineffective assistance of counsel for soliciting and accepting waiver of Batson challenges.

Point 2-1-5    Failure to challenge the venire on the basis that it did not represent a cross-section of the community.

Point 2-1-6    Ineffective assistance of counsel for consenting to removal of jurors without their presence.

Point 2-1-7    Failure to move for individual voir dire.

Point 2-1-8    Failure to meaningfully voir dire on the subject of mitigating evidence.

Point 2-1-9    Failure to voir dire on the issue of race.

Point 2-1-10    Failure to voir dire on the issue of domestic violence.

Point 2-1-11    Failure to move for the exclusion of jurors Karen Speaks and Terry Williams or in the alternative request questioning regarding the defendant's comments during voir dire.

Point 2-1-12    Failure to challenge juror William Sowell who had an established relationship with the prosecution.

Point 2-1-13    Failure to challenge juror Karen Speaks who had prejudged Mr. Springs' guilt.

Point 2-1-14    Failure to challenge juror Joe Marchant.

Issue 2-2    Failure to investigate and present relevant claims and evidence regarding Mr. Springs' mental illness.

Issue 2-3    Failure to object to unsworn and improper victim impact evidence at the guilt phase.

Issue 2-4    Failure to object to inflammatory and prejudicial evidence.

Issue 2-5    Failure to argue all legal and factual [bases] for a manslaughter instruction.

Issue 2-6    Failure to object to prejudicial jury instructions and to demand favorable jury instructions.

Issue 2-7    Failure to discover and object to juror misconduct.

Issue 2-8    Failure to object to prosecutorial misconduct.

Issue 2-9    Failure to fully litigate cumulative error claim.

Issue 2-10    Counsel's overall performance was unreasonable and counsel's multiple unreasonable errors were cumulatively prejudicial.

Claim 3.    Mr. Springs received ineffective assistance of counsel at sentencing.

Issue 3-1    Failure to investigate and present evidence in mitigation.

Point 3-1-1    Failure to conduct a thorough social history investigation.

Point 3-1-2    Failure to present evidence of bipolar disorder.

11

Point 3-1-3     Failure to present evidence of psychotic disorder.

Point 3-1-4     Failure to present evidence of complex post traumatic stress disorder.

Point 3-1-5     Failure to present evidence of brain damage.

Point 3-1-6     Failure to investigate and present evidence regarding Mr. Springs' prescribed medication on his conduct.

Point 3-1-7     Failure to argue and present evidence that Mr. Springs' multiple mental impairments prevented him from forming the mental states for two of the three aggravating factors.

Point 3-1-8     Failure to argue that the death penalty was an inappropriate punishment for Mr. Springs due to mental illness.

Point 3-1-9     Ineffective assistance of counsel for agreeing to redaction of mitigation evidence.

Point 3-1-10    Failure to call Michael Springs as a mitigation witness.

Point 3-1-11    Failure to call Joshua Mooring, Matthew Mooring, and Chantelle Mooring as mitigation witnesses.

Point 3-1-12    Ineffective assistance for soliciting and accepting a waiver from Thomas Springs regarding an entire class of mitigation evidence.

Point 3-1-13    Failure to offer Mr. Springs' willingness to plead guilty in exchange for a life without parole sentence as mitigation.

Issue 3-2       Failure to object to language in jury instructions that indicated the possibility of future release.

Issue 3-3       Failure to discover and object to juror misconduct.

Issue 3-4        Failure to object to prosecutorial misconduct.

Issue 3-5        Failure to object to improper victim impact testimony.

Issue 3-6        Failure to object to the presentation of allegations that Mr. Springs had threatened to "cut" a jail guard.

Issue 3-7        Failure to object to the introduction of written victim impact statements.

Issue 3-8        Failure to fully litigate cumulative error claim.

Issue 3-9        Counsel's overall performance was unreasonable and counsel's multiple unreasonable errors were cumulatively prejudicial.

Claim 4.        Mr. Springs' right to a fair and representative jury was violated.

Issue 4-1        The trial judge unfairly refused to change venue despite extremely prejudicial pretrial publicity.

Point 4-1-1        The state court record shows that Mr. Springs' Sixth and Fourteenth Amendment rights were violated.

Point 4-1-2        Additional evidence shows that Mr. Springs' Sixth and Fourteenth Amendment rights were violated.

Issue 4-2        The "fair cross-section" requirement was violated.

Issue 4-3        The prosecution exercised peremptories in a discriminatory manner.

Point 4-3-1        Discriminatory strikes against African-American jurors.

Point 4-3-2        Discriminatory strikes against female jurors.

Issue 4-4        During voir dire the trial judge erroneously excused jurors who were qualified to serve.

Point 4-4-1        Prospective juror Donald Bray was erroneously excused.

Point 4-4-2 Prospective juror Deborah Siebert was erroneously excused.

Point 4-4-3 The trial judge erroneously excused jurors in absentia.

Claim 5. Prosecutorial misconduct tainted Mr. Springs' trial and sentencing.

Issue 5-1 The prosecutor withheld material, exculpatory evidence.

Point 5-1-1 Thomas Springs' prior suicide attempts while in police custody.

Point 5-1-2 The state withheld evidence that Mr. Springs was being treated for mental illness during pretrial detention.

Point 5-1-3 The state withheld evidence that Mr. Springs' family was mentally ill.

Point 5-1-4 The state withheld material mitigating evidence.

Issue 5-2 The prosecutor made improper comments during the guilt phase.

Point 5-2-1 Injecting personal opinion.

Point 5-2-2 Relaying the decedent's family's opinion.

Point 5-2-3 The prosecution improperly shifted the burden of proof.

Point 5-2-4 The prosecutor made arguments not supported by the evidence.

Issue 5-3 The prosecution improperly utilized victim impact information at the guilt phase of Mr. Springs' trial.

Issue 5-4 The prosecutor engaged in misconduct during the penalty phase.

Point 5-4-1 Injecting personal opinion.

Point 5-4-2 The prosecution improperly commented on Mr. Springs' right to remain silent at the penalty phase of Mr. Springs' trial.

Point 5-4-3 The prosecution improperly shifted the burden of proof.

Point 5-4-4 The prosecution misstated the law regarding mitigation evidence.

Point 5-4-5 The prosecution made improper comments regarding the use of the death penalty to deter others.

Point 5-4-6 The prosecution misled the jury regarding the possibility of Mr. Springs' future release.

Point 5-4-7 The prosecution improperly commented on Mr. Springs' exercising his right to jury trial.

Point 5-4-8 The prosecution improperly removed responsibility for the sentencing decision from the jury.

Point 5-4-9 The prosecution improperly commented on the victim's family's preference for a death sentence.

Point 5-4-10 The prosecution improperly argued future dangerousness.

Point 5-4-11 The prosecution made inflammatory comments regarding the defense's closing argument.

Point 5-4-12 The prosecution improperly compared the defendant's situation to the plight of the victim.

Issue 5-5 Ineffective assistance of counsel for failing to object to prosecutorial misconduct.

Claim 6. Mr. Springs was denied a fair adjudication of his guilt or innocence.

15

Issue 6-1          The trial court erred in failing to give a manslaughter instruction.

Issue 6-2          The trial court erred in allowing the introduction of prejudicial, inflammatory autopsy photographs.

Claim 7.          Mr. Springs was denied a fair adjudication of his sentence.

Issue 7-1          The trial court erred in excluding relevant mitigating evidence.

Issue 7-2          The trial court erred in accepting Mr. Springs' waiver of mitigating evidence.

Issue 7-3          The trial court erred in failing to provide the jury with a verdict form enumerating the specific mitigating factors.

Issue 7-4          Failure to provide Mr. Springs with notice of the aggravating factors against him and a verdict form containing only those aggravating factors.

Issue 7-5          The trial court erred in misleadingly instructing the jury regarding Mr. Springs' potential future release from prison.

Issue 7-6          The State used improper and unconstitutional "victim impact" testimony at the penalty phase of Mr. Springs' case.

Point 7-6-1     The victim impact testimony violated Mr. Springs' constitutional rights.

Point 7-6-2     Ineffective assistance of counsel for failing to object to the introduction of written victim impact statements.

Point 7-6-3     Ineffective assistance of counsel for failing to raise victim impact issues.

Claim 8.          Mr. Springs received ineffective assistance of counsel during the post-trial period.

Issue 8-1          Trial counsel failed to investigate for and raise claims of juror misconduct.

16

Issue 8-2        Trial counsel failed to raise claims of ineffective assistance of counsel.

Claim 9.        Mr. Springs received ineffective assistance of counsel on direct appeal.

Issue 9-1        Competency to stand trial, death ineligibility.

Issue 9-2        Ineffective assistance of counsel at trial.

Issue 9-3        Ineffective assistance of counsel at sentencing.

Issue 9-4        Fair and representative jury.

Issue 9-5        Prosecutorial misconduct.

Issue 9-6        Fair adjudication of guilt or innocence.

Issue 9-7        Fair adjudication of sentence.

Issue 9-8        Ineffective assistance of counsel during the post-trial period.

Issue 9-9        Cumulative error.

Issue 9-10       Cumulative performance unreasonable and prejudicial.

Claim 10.       Mr. Springs received ineffective assistance of counsel during his post-conviction proceedings.

Claim 11.       Mr. Springs' rights were violated by juror misconduct.

Issue 11-1       There was improper and suspect contact between jurors 11 and 12.

Issue 11-2       Juror deliberations occurred outside the presence of the full jury.

Issue 11-3       Jurors were pressured to reach a verdict.

Claim 12.       The death penalty violates the Eighth Amendment.

Claim 13.      The court should conduct a cumulative assessment of whether constitutional errors occurred and whether such errors were prejudicial.

## III. STANDARD OF REVIEW

Section 2254 of Title 28 of the United States Code permits a prisoner in state custody to petition a federal court for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1996). Section 2254(d) provides as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has explained:

[Section] 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing

legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

Principles of federalism dictate that the state courts should have a proper opportunity to address claims of constitutional error asserted by a person convicted in state court before those claims are presented to a federal court. *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991). "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 732, 111 S. Ct. at 2555. Thus, "a state prisoner's federal habeas petition should be dismissed, if the prisoner has not exhausted available state remedies as to any of his federal claims." *Id.* at 731, 111 S. Ct. at 2555. The requirement of exhaustion of remedies is satisfied if the petitioner has "fairly presented" his claims to the state court, which means that "the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been raised in the prisoner's state court proceedings," thus giving "'the highest state court a fair opportunity to rule on the factual and theoretical substance of [the] claim.'" *Krimmel v. Hopkins*, 56 F.3d 873, 876 (8th Cir. 1995) (quoting *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993)). "In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997) (citations omitted). A claim may be lost due to procedural default at any level of state court review: at trial, on direct appeal, or in the course of state post-conviction proceedings. *Kilmartin v. Kemna*, 253 F.3d 1087, 1088 (8th Cir. 2001); *see also Noel v. Norris*, 194 F. Supp. 2d 893, 903 (E.D. Ark. 2002).

However, "'only a firmly established and regularly followed state practice' is a procedural bar to federal habeas review." *Clay v. Norris*, 485 F.3d 1037, 1040 (8th Cir. 2007) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991)).  In other words, a decision based on a state procedural rule that is not strictly or regularly followed does not give rise to procedural default.  *Id*.

## IV.  GROUNDS FOR RELIEF THAT SPRINGS HAS PRESENTED TO THE STATE COURTS

Springs failed to present the majority of his current claims to the state courts.  The claims that he presented to the state courts will be addressed in this section.

### A.    Claim 1 (Points 1-1-5 and 1-3-2)

Point 1-1-5 alleges that the trial court erred in failing to appoint a head injury expert *sua sponte*.  That argument was made on direct appeal and rejected by the Arkansas Supreme Court. *Springs I*, 368 Ark. at 260-63, 244 S.W.3d at 686-88.  In rejecting Springs' argument that the trial court had a duty to intervene and appoint a head injury expert *sua sponte*, the court addressed two arguments, one based on state procedural rules and one based upon the Fourteenth Amendment.

Beginning with the latter argument, in *Ake v. Oklahoma* the Supreme Court said that the Fourteenth Amendment requires that a state provide an indigent defendant with the "basic tools of an adequate defense."  470 U.S. 68, 77, 105 S. Ct. 1087, 1093, 84 L. Ed. 2d 53 (1985) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S. Ct. 431, 433, 30 L. Ed. 2d 400 (1971)).

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake*, 470 U.S. at 83, 105 S. Ct. at 1096.  The Arkansas Supreme Court took note of the United States Supreme Court's holding in *Ake* and held that the trial court complied with *Ake*'s requirements by granting Springs' motion for a psychological examination, pursuant to which Springs was examined by Dr. Deyoub.  *Springs I*, 368 Ark. at 262, 244 S.W.3d at 687-88.  This interpretation of *Ake* by the Arkansas Supreme Court is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; nor is the decision of the Arkansas Supreme Court based on an unreasonable determination of the facts.

In addition to this argument based on the United States Constitution, Springs contended on direct appeal that the trial court should have appointed a head injury expert *sua sponte* pursuant to the requirements of *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), which creates four exceptions to the rule requiring a contemporaneous objection to preserve an issue for appeal. *Springs*, 368 Ark. at 260-61, 244 S.W.3d at 686.  The four exceptions articulated in *Wicks* relate to state procedural requirements.  The Arkansas Supreme Court's interpretation of its own procedural rules is not subject to review in this Court.  *Baker v. Leapley*, 965 F.2d 657, 659 (8th Cir. 1992) (a state court's interpretation of state law binds a federal court in a habeas proceeding).

Point 1-3-2 is that the trial court erred in accepting a waiver of evidence at the penalty phase. At the penalty phase, Springs' lawyers intended to call witnesses who would testify that at various times Christina had made racially derogatory statements to one or more of the children and had abused one or more of the children.  The trial judge called Springs to the bench, summarized the evidence that his lawyers wished to introduce, explained Springs' right to introduce mitigating circumstances and the process by which the court would determine the admissibility of the evidence. The court inquired regarding Springs' education and other matters pertaining to his ability to

understand.  Springs waived his right to present that mitigating evidence, saying that he did not want witnesses to criticize his deceased wife, and the court found that he did so freely and voluntarily.[6]

In his Rule 37 proceeding, Springs argued that the waiver of his constitutional right to present this mitigating evidence was not done knowingly and intelligently and that his lawyers were ineffective for failing to inform him properly of the strength of his claim to present this evidence. The Arkansas Supreme Court rejected Springs' argument that he did not make a knowing and intelligent waiver of his constitutional rights on procedural grounds, holding that under Rule 37 of the Arkansas Rules of Criminal Procedure, "allegations of trial error, even constitutional ones, are not grounds for post-conviction relief." *Springs II*, 2012 Ark. 87, at 24, 387 S.W.3d at 159.  The court also rejected Springs' related claim that his lawyers were ineffective for failing to inform him of the strength of his evidence because "Appellant has presented nothing more than a conclusory allegation that counsel was ineffective," and such "conclusory statements cannot be the basis of post-conviction relief."  *Id.*  These determinations by the Arkansas Supreme Court are based on adequate and independent state procedural grounds which cannot be reviewed by this Court.

Springs' Point 1-3-2 here is somewhat different from the argument that he made to the Arkansas Supreme Court.  Here, Point 1-3-2 is a part of Issue 1-1, that Springs was not competent to stand trial, which is a part of Claim 1, i.e., that his convictions and sentences should be vacated because he was mentally ill at the time of the crime and throughout the state court proceedings. Thus, Springs' Point 1-3-2 contends that Springs' waiver of his constitutional right to present mitigating evidence was not made knowingly and intelligently because Springs was not capable of

---

[6] The page of the trial transcript (p. 1738) on which this finding is recorded is missing from the copy of the transcript filed here.  Springs' abstract in his Rule 37 appeal, however, includes this colloquy between the court and Springs in its entirety.  *See* Respondent's Exhibit 8 at Abstract 146-51.

a rational understanding of his waiver, and his claim that his lawyers were ineffective is a claim that they knew or should have known that Springs was so mentally ill that he could not make a knowing and intelligent waiver. The precise arguments that Springs attempts to make here have never been presented to the Arkansas courts.

## B.      Claim 2 (Point 2-1-9)

Springs' second claim is that he received ineffective assistance of counsel during the guilt phase of the trial. Of the ten issues and fourteen points that he presents in support of that claim, the only one that was presented to the Arkansas courts is Point 2-1-9, that his trial lawyers were ineffective because they failed to voir dire the jury panel on the issue of race. That argument was presented in Springs' Rule 37 petition and was rejected by the Arkansas Supreme Court on appeal. *Springs II*, 2012 Ark. 87, at 20-22, 387 S.W.3d at 157-58.

As noted above, Springs is black, whereas his wife was white. Springs' lawyers did not voir dire the jury panel regarding their attitudes toward race or interracial marriage.

At trial, Joplin took the lead, and Haaser was second chair. Joplin had been certified as lead counsel by the public defender's commission at that time, while Haaser had been certified to assist a lead attorney in a capital case.

At the Rule 37 hearing, Joplin testified that he decided not to voir dire the jury on the question of race. Before making that decision, he conducted legal research and was aware of case-law that allowed a defendant to have questions asked about race.[7] He also discussed the issue with Haaser. Although Haaser was in favor of asking potential jurors about their attitudes toward race

---

[7] *See Turner v. Murray*, 476 U.S. 28, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (holding that a defendant accused of an interracial capital crime is entitled to have prospective jurors informed of the victim's race and questioned on the issue of racial bias).

during voir dire, Joplin made the decision not to do so.  He testified that he was unable to determine how to ask the questions in a sensitive way.  He said, "My concern was that however it was asked . . . the jury would just hear it as, for want of a better term, throwing race in as an issue or he is trying to get off because he is black, just for want of a better term."  Joplin testified that "it wasn't an appropriate strategic decision because I didn't give meaningful enough consideration to ask the questions in a sensitive way."  Similarly, Haaser testified that Joplin decided not to ask questions regarding race during voir dire because he "felt like that the message may be to the jury that Mr. Springs was asking for sympathy for the wrong reasons.  So, that is why we ultimately decided not to."

After summarizing the testimony by Joplin and Haaser on this point, the Arkansas Supreme Court rejected Springs' claim that their decision constituted ineffective assistance of counsel, explaining:

> Even though Joplin admitted that he probably should have conducted some voir dire on this issue, it is clear that his choice not to do so was a strategic one.  This is highlighted by his testimony, as well as the testimony of co-counsel Haaser.  This court has repeatedly held that matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel.  *Williams v. State*, 2011 Ark. 489, 385 S.W.3d 228; *Noel v. State*, 342 Ark. 35, 26 S.W.3d 123 (2000).  Thus, even though another attorney may have chosen a different course, trial strategy, even if it proves unsuccessful, is a matter of professional judgment.  *Williams*, 2011 Ark. 489, 385 S.W.3d 228.  Accordingly, we agree with the circuit court that Appellant was not entitled to relief based on this claim, as Appellant failed to demonstrate that his counsel was ineffective in this regard.

*Springs II*, 2012 Ark. 87, at 15, 387 S.W.3d at 158.

The standards for determining whether a criminal defendant has received ineffective assistance of counsel are:

24

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

Furthermore:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id*. at 689, 104 S. Ct. at 2065 (citations and quotation marks omitted). In addition, "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690-91, 104 S. Ct. at 2066.

The Arkansas Supreme Court's rejection of Springs' claim that his lawyers were ineffective for failing to voir dire the jury about race is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; nor is it based on an unreasonable determination of the facts. In a similar case, the Third Circuit explained:

> [If defense] counsel had requested voir dire respecting racial prejudice, the trial court would have been constitutionally bound to grant his request. *See Turner*, 476 U.S. at 36-37, 106 S. Ct. at 1683. Our review of the entire voir dire confirms that counsel did not ask any questions of any potential jurors regarding racial prejudice. Certainly nothing in the record suggests that the [victim's] killing was racially motivated. Counsel reasonably could have believed that probing the jurors' potential racial prejudices might unduly emphasize the racial differences, somehow inject racial issues into a trial where none existed, or taint the jurors' view of [the defendant] and his attorney. In other words, counsel reasonably could have concluded that asking prospective jurors questions about racial prejudice would do more harm than good. Under these circumstances, and in the absence of any evidence to the contrary, we presume that counsel's decision was sound trial strategy.

*Jacobs v. Horn*, 395 F.3d 92, 118 (3d Cir. 2005); *see also Preyor v. Stephens*, 537 Fed. App'x 412, 427 (5th Cir. 2013) (per curiam) (denying a certificate of appealability on a claim that defense counsel was ineffective for failing to voir dire regarding race in a case in which the defendant was black and his victim was white); *Mahdi v. Bagley*, 522 F.3d 631, 636-38 (6th Cir. 2008) (holding that the Ohio Supreme Court did not unreasonably apply clearly established law by concluding that counsel was not ineffective for failing to voir dire on religious and racial prejudice); *Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000) (rejecting a claim that a lawyer provided ineffective assistance of counsel when he failed to voir dire about race where the defendant was black and the victim was white because "there are tactical reasons why a lawyer would not want to direct the jurors' attention to the interracial character of the crime"); *Spencer v. Murray*, 18 F.3d 229, 234 (4th Cir. 1994) (holding that the decision by the defendant's lawyers not to voir dire on race was a sound trial strategy); *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980) (the decision whether to voir dire regarding racial bias was a strategic decision by defense counsel and was not ineffective representation); *Fink v. Fabian*, Civil No. 06-3908 (RHK/RLE), 2007 WL 4209091, at *6 (D. Minn. Nov. 26, 2007) (holding that a state court did not unreasonably apply clearly established federal law

26

in holding that a defense lawyer's failure to engage in further inquiry regarding racial prejudices was a question of trial strategy); *Eason v. Everett Municipal Court*, No. C06-322-JCC, 2007 WL 1991180, at *8 (W.D. Wash. July 9, 2007) (holding that defense counsel was not ineffective for failing to inquire into racial bias during voir dire in a criminal case involving an interracial marriage).

**C.      Claim 3 (Points 3-1-11 and 3-1-12; Issues 3-4, 3-6, and 3-7)**

Springs' third claim is that he received ineffective assistance of counsel at the penalty phase of the trial.  He presents nine issues and thirteen points as part of this claim.  Two of the points and three of the issues have been presented to the state courts, at least in part.

Springs' Point 3-1-11 is that his trial lawyers were ineffective in not interviewing and in failing to call to the stand the older children, Joshua Mooring, Matthew Mooring, and Chantelle Mooring, as mitigation witnesses.  This issue is significant and deserves an in-depth discussion.

After the jury found Springs guilty of capital murder, the State and Springs presented additional evidence for the jury to consider in determining the appropriate sentence.  The State's final witness was Jacob Springs, Christina and Thomas Springs' then twelve-year-old son, who read from the stand his prepared victim-impact statement, with Kelly Repking standing next to him.  The statement read in full:

> My name is Jacob Taylor Springs.  I am twelve years old.  I am in the seventh grade.  My mother was Christina Springs.  I would like the jury and the judge to know how I feel about what happened to my mother.
> My life changed a lot because my dad killed my mom.  It is hard to wake up in the morning because my mom isn't here to be by me.  My Aunt Kelly is still there for me, and my Aunt Ashley, and my Aunt Brittany and my Aunt Laura, and my Papa.  I love them for that.  But I miss my mom.
> Me and my brothers and sister don't live together anymore because they are all in DHS because of what my dad did to my mom.  I live with what dad did every day.  She is gone from my life now.  We used to talk a lot.  She was a good friend.

We used to talk about how when I grew up I was going to buy a new car for her.  She always came to see my school stuff and said she was proud of me.

I miss her so much!  I can't sleep at night because I look at mom's picture.  I have to go to bed at 9:00 p.m. every night but I stay up looking at mom's picture until two or three in the morning because I feel it is my fault that she is gone.  If she just didn't go to my school that morning, she'd still be with me.

I feel like I don't have anything to live for anymore.  When my dad killed my mom I didn't know how I was going to live without her.  She was my life.  When the police told me that my dad killed my mom I was so hurt inside my heart.  I am on medicine now and I am not eating that much anymore.  I weighed 89 pounds when my dad killed my mom and now I weigh 79 pounds, but they put me on some medicine so I can eat more and so I can feel happier because I was so sad and mad.  My mom was loved by so many people.  My dad took her away from our lives forever.  Dad, I want you to know you are so selfish to take her away.  One day you said if you can't have her no one can have her.  I didn't know you meant us kids too.  I just want to know why you killed my mom.  Will you tell me when I grow up?

Every time I see my mom and dad's pictures in the newspaper it makes me so sad and I just feel so mad too.  I have to live with it everyday of my life.  Now I go to a school called Perspectives day school where I get daily therapy.  I don't really want to be there, but at Ramsey I was having a hard time.

Me and mom did lots of stuff together.  We went to the store, the mall, to the car wash, and to Wal-Mart.  We played around together.  It was so much fun when she was alive.  All I have to remember her by is pictures, her grave and a statue called "Angel of Grief" at the Crisis Center.  My mom will never be forgotten.

If I could have one wish in the whole world it would be for my mom to come back.

Springs' lawyer called fourteen witnesses to the stand, including Springs' neighbors, friends, co-workers, and sister, who testified as to Springs' positive qualities, including that he was an honorable person and a good father.

Although Springs' lawyer did not call any of Springs' children to testify, he began his closing argument at the trial's penalty phase by focusing on the children:

It was said sometime yesterday, I heard it said that this was about control, that this was about control by Thomas.  Actually, ladies and gentlemen, it was not about control.  The reason I say that is because of something that I heard from the testimony of Kelly, Christina's sister.  She talked about whenever Thomas came up to the car and she said that Chrissy looked at Thomas and said, You can see your kids.  Ladies and gentlemen, this was not about control.  This was about his children.  The reason that I tell you that is because his wife who knew him, that is what she

said when he walked up.  You can have your children.  She knew what was in her husband's mind.  She knew what was in his heart, and she said, You can see the children.  She knew it was about the children.

I cannot imagine what it would be like to be a troubled father and be at home where you lived for several years with six children and a wife, and then find that that home had suddenly become a dark and a silent and a lonely place. . . .  When you have lived in this home for a number of years and you have gone and worked and gone home and you have played with your children, you ate with your children, . . . and then suddenly the home has become a very silent place and a sad place.

At the end of his closing argument, in the context of discussing mitigating circumstances, Springs' lawyer returned to the children and to the question of their future relationship with their father:

Ladies and gentlemen, even if you are locked away in prison you can do good things and you can reach people.

. . . As I said, you just never know when someone will find a way to manage to do something.  I thought something that was interesting yesterday, and it was poignant, one of the things that was mentioned and that was from Jacob's letter, and I would ask you to take that and look at it.  It is a victim impact.  He says in that letter, When I grow up I want an answer.  The fact is, ladies and gentlemen, you are not going to get an answer from a tombstone that says Thomas Leo Springs.

Ladies and gentlemen, I can't say what is in the future.  I can just say that perhaps some day one or more of these children that was drawn into this tragedy by their father, no fault of their own, one or more of these children may want to reconnect with the man that was at McDonald's with him.  That is a possibility.

The prosecutor focused on that specific argument in his rebuttal:

Then, he hides behind the victim impact statement of his child.  Maybe someday he will have a conversation with him that will make it all right.  Chances for making it all right are long gone.  This is like someone killing their parents and then asking for mercy because they are an orphan.  He has killed their mother, their mother, and now says, Don't give him this harsh sentence so he can do something for them later.  If he is thinking about his kids, why did he do the thing that hurts them the most?

The jury unanimously found three aggravating circumstances: (1) that Springs previously committed another felony an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person; (2) that in the commission of the capital murder, Springs knowingly created a risk of death to a person other

29

than the victim; and (3) that the capital murder was committed in an especially cruel or depraved manner.  At least one but not all members of the jury found four mitigating circumstances.  Three were mitigating circumstances already listed on the verdict form: (1) that the capital murder was committed while Springs was under extreme mental or emotional disturbance; (2) that the capital murder was committed while Springs was acting under unusual pressures or influences or under the domination of another person; and (3) that the capital murder was committed while the capacity of Springs to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse.  The fourth mitigating circumstance was in a section of the verdict form titled "other mitigating circumstances" in which the jurors could specify in writing any other mitigating circumstances that at least one but not all members found probably existed, and they wrote: "Thomas Leo Springs has 6 children and at least one of them has expressed a wish to get an answer to why his father killed his mother – when he grows up."  The jury unanimously concluded that the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances found by any juror and that the aggravating circumstances justified beyond a reasonable doubt a sentence of death.

After the jury returned its verdict but before the judge imposed the sentence, three of Springs' children, Joshua Mooring, Matthew Mooring, and Chantelle Mooring, were sworn in as witnesses and read impact statements.  Matthew Mooring's statement read in full:

> I am Matt, I am 16 and I have come today to talk to you all about my mom. My mom was a wonderful woman.  She was my best friend.  We would tell each other secrets and sometimes we would even wrestle at night when everybody else was sleeping.  I would always get beat, but you have got to be a good sport about everything.  She was something, though.  She was friends with everyone she met. She taught me how to be a respectful, young gentleman.  She raised me right.  What can I say?  Despite what happens here today I know that she is in a better place and she is happy.  I love her now and I loved her then.  I will love her later.  I always

will.  Sometimes when you love someone you are happy when they are gone even [if] it hurts you to be without them.  I know she is happy and with that in mind I'm happy, too.

I want to say a little about my dad now.  My dad, he was a good guy and more than half the time he was a great dad.  I am not going to sit up here and lie and I am not going to say that he was a bad guy because my dad was a great person.  He treated me and my family right most of the time.  He taught us how to grow up and be respectful.  He taught us how to be nice to people and say, yes, ma'am; no, ma'am; yes, sir.  He loved to get involved in extracurricular activities.  He even saved me once when I got hit by a car.  Even though I wish today that what happened wouldn't have happened and that we would still, you know, be in contact.  I feel really bad and I am sorry that he had to – that what happened happened, but I just hope that, you know, everybody has their place in God's eyes and he may have messed up, but he still has his chance to redeem himself.  I want him to know that me and his kids, my brothers and sister, we love him to death and we care about him more than anything.  Even though mom is gone, it doesn't mean that he is not our dad just because you do something that makes people or makes your kids hate you doesn't mean that they don't love you because we love you for who you are, but they hate you for what you did.  Well, thanks for listening.

Chantelle Mooring's statement read in full:

My name is Chantelle Mooring.  I am 18 years old.  My mom was Christina Springs.  I would like you to know about my mother and what she meant to me.

I remember my mother always talking about a time and place where she could be happy and smile, where my brothers and I would be with her, free from fear of danger.  In this place we would always be smiling and laughing and happy.

I remember the long talks we would have, sometimes all night until 3:00 or 4:00 in the morning even on school nights, just to pick each other up.  We would laugh and say things like I wish or I dream of.  I remember how we would laugh and we would cry together, how we would talk about my brothers and I getting married and having kids of our own.  She always wanted the best for us.  She would dream to see it come true for us, but now the dream is over and the wishes are gone.  Now all I feel is loneliness, fear, sadness and shame.  She will never see any of those things that we used to dream about together.  She will never be a grandmother or a mother-in-law.  She won't even get to see us graduate.

There is so much I won't get to tell my mom.  I will never be able to tell her that I got a diploma, or I am getting married, or show her her beautiful grandchildren.  None of us will get to because of a selfish act of anger.

My heart longs for my mother everyday.  I cry just begging God to see her smile or smell her hair or touch her face again.  Sometimes I want to ask mom what I should [d]o.  She always knew what to say.  She was always my best friend, she was my sister and my mother.  I took advantage of her so many times and yet she would still smile and hug me when we were alone and say, Baby, it is okay.  I

31

forgive you and I will always love you.  She used to say, You will always be my baby.  But now I will never hear it again because of my dad.

   This has changed me from what I was to what I sadly am now, but it's okay because she is with my grandma.  Mom always said that if she couldn't be free and alive with her children she would rather be in heaven with my granny.  She is free now.

   I would like to say, dad, I love you very much.  It is okay and I will forgive you.  The kids, we forgive you and we understand and we don't hate you.  I wish what happened didn't have to happen, but it is okay because everything happens for a reason.  I remember you and mom always saying that, and it is okay.

In his amended petition for relief under Arkansas Rule of Criminal Procedure 37, Springs requested relief because his trial lawyers were ineffective in failing to call other mitigation witnesses: "Specifically, Chantelle Mooring and Matthew Mooring, children of the deceased, would have testified as defense witnesses and would have asked the jury to be merciful and would have testified to various positive personal characteristics of Springs."[8]

In a hearing on Springs' Rule 37 petition, Joplin, who was Springs' lead trial lawyer and who was in charge of the penalty phase of the trial, testified that he had not interviewed Springs' children to determine whether they would testify on his behalf at the penalty phase of the trial and could not remember having a conversation with co-counsel about that issue.  He testified that he should have considered that issue.

At the same hearing, Matthew Mooring testified that if his father's lawyer had contacted him prior to the penalty phase of the trial, he would have been willing to testify on his father's behalf and would have said,

   Well, he was a good man, you know, he had – everybody has faults and everyone makes mistakes, but, I mean, he is my dad and he is my sister's dad and he is my brothers' dad and, you know, they had already lost one parent and, you know, him being alive gives them something to be, you know, they could write him, they can

---

[8] Springs did not assert in his Rule 37 petition that the failure to call Joshua constituted ineffective assistance of counsel.

have something to keep up with and, you know, I wouldn't want them to lose their father and I wouldn't want to lose mine because then it feels like we have nobody.

He also would have discussed further positive aspects of his father:

We never needed anything.  We didn't need – we were never without a home, we were never without shelter, we were never without proper education, clothes for school, we never needed food, we never needed anything.  He worked hard, he worked overtime, he did whatever he had to to make sure that everybody in the family was taken care of.

The Circuit Court of Sebastian County denied Springs' Rule 37 petition on this issue because, according to the court, much of Matthew's testimony would have been cumulative, and, under *Greene v. State*, 343 Ark. 526, 37 S.W.3d 579 (2001), any possible testimony related to an appropriate sentence may not have been relevant to the issue of punishment.

On appeal, Springs argued that his trial lawyers were ineffective in failing to interview his older children and he therefore was deprived of Matthew's beneficial testimony.  Springs did not argue, as he did at the circuit court, that Chantelle also would have testified on her father's behalf at the penalty phase of the trial.[9]

The Arkansas Supreme Court held that Springs' trial lawyers were ineffective in not interviewing Springs' children and in not calling Matthew to testify as a mitigation witness but that Springs had failed to demonstrate a reasonable probability that Matthew's testimony would have altered the outcome of the sentencing.  The parties do not contest the Arkansas Supreme Court's holding that Springs' trial lawyers were ineffective in not interviewing Springs' children and in failing to call Matthew as a mitigation witness.  The contested issue is whether the Arkansas

---

[9] Chantelle did not testify at the Rule 37 hearing.  Springs alleges in his petition here that Rosenzweig was ineffective because he followed Springs' directive not to call Chantelle.  Springs' section 2255 petition alleges "Mr. Springs opposed calling her as a witness because on the eve of the hearing Mr. Springs dreamt of President Obama's dog, Bo.  He believed the dream to be a message that his daughter would humiliate him during the hearing."  Document #1 at 41.

Supreme Court's decision that Springs failed to establish prejudice was contrary to or involved an unreasonable application of clearly established law, as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts.

As noted, to overturn a death sentence due to ineffective assistance of counsel, a petitioner must show that counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Prejudice "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. To assess prejudice, a court reweighs the aggravating evidence against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003). Further, because 28 U.S.C. § 2254(d) adds a layer of deference, a habeas petitioner "is entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of' *Strickland*, or it rested 'on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 452, 175 L. Ed. 2d 398 (2009) (per curiam) (quoting 28 U.S.C. § 2254(d)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000) (*Terry Williams*).

The Arkansas Supreme Court identified the correct governing legal principle to determine whether his lawyers' failure to call Matthew prejudiced Springs – i.e., the *Strickland* standard. *See*

*id.* at 391, 120 S. Ct. at 1512 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").  The court then applied the *Strickland* standard to the facts, concluding that Springs was unable to meet the standard for showing prejudice.

The court's first reason for its holding on the prejudice issue was that Matthew's statement was not comparable to Jacob's.  It is unclear why the statements' incomparability means that even if the jury heard Matthew's testimony, a reasonable probability would not have existed that the jury would have imposed a different sentence.  Matthew's testimony has mitigating value on its own because it describes his father's positive qualities and it attests to the love the children felt for him and their need for him to remain alive.

Jacob's and Matthew's statements, however, are comparable in at least one way.  Jacob was the only one of Springs' children to testify.  His testimony conveyed a sense of anger and resentment towards his father, not a sense of forgiveness or love.  The jury may have assumed that Jacob's testimony represented the views of all of the children, since none of the others testified.  In other words, the jurors may have been left with the impression that Springs' children believed that he was not a person of good character.  "[C]haracter evidence in capital trials, especially that relating to defendants' love for and by family and friends, plays a critically important yet intangible role."  Wayne A. Logan, *When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials*, 33 U. Mich. J.L. Reform 1, 13 (2000).  Matthew's testimony would have counteracted this impression.  Matthew testified that Springs' children loved and forgave their father, and his testimony leaves the distinct impression that his father was a good person.  At trial, for instance, after the jury returned its verdict, Matthew testified:

> I am not going to sit up here and lie and I am not going to say that he was a bad guy because my dad was a great person.  He treated me and my family right most of the time.  He taught us how to grow up and be respectful. . . .  I want him to know that me and his kids, my brothers and sister, we love him to death and we care about him more than anything.

The jury reasonably may have found additional mitigating circumstances as a result of Matthew's testimony.  At least one juror found as a mitigating circumstance Jacob's wish to know when he grew up why his father killed his mother.  This was not one of the mitigating circumstance listed on the verdict form but rather was written in, which indicates that at least one member of the jury had a heightened interest in Springs' child's testimony or was concerned about Springs' relationship with his children and the effect his death would have on them.[10]  Matthew's testimony would have given that juror or those jurors more than one sentence of testimony upon which to assess the children's future relationships with their father and the effect his death would have on those relationships.  *See DeYoung v. Schofield*, 609 F.3d 1260, 1269 (11th Cir. 2009) (quoting lead trial counsel as saying that when the family of the victims are also kin to the defendant and are "asking the jury to spare their grandson's life, I don't know how much more compelling mitigation evidence you can get"); *Romine v. State*, 251 Ga. 208, 217-18, 305 S.E.2d 93, 101 (1983) ("Ralph's [mitigation] testimony would have been particularly significant because he was closely related not only to the appellant but also to the victims . . . .").

---

[10] In his reply brief in support of his habeas petition, Springs asserts that one juror from his trial gave "a sworn statement that she was in favor of a life sentence because Mr. Springs' children had already lost one parent and because Mr. Springs could still be a parent in prison."  Document #20 at 100.  Springs then argues that the juror's will was overcome by two other jurors but that other jurors may have supported her position "had her intuition that the kids needed and wanted their father around been backed up by moving testimony at trial."  *Id.*  Springs does not cite to the location of the juror's sworn statement in the record, and the Court is unable to find such a statement.

The Arkansas Supreme Court's second reason for concluding that *Strickland* prejudice did not apply was that much of Matthew's testimony was cumulative to that of other witnesses, specifically the portion of Matthew's testimony that Springs "was generally a good father and a good provider."  The parts that were not cumulative – his children's love for him, their forgiveness, how his death would affect them – would have had independent mitigating value, as explained. Moreover, even though other witnesses testified that Springs was a good father and a good provider, none of his children so testified.  *See Rankin v. State*, 365 Ark. 255, 260, 227 S.W.3d 924, 928 (2006) (aunt's testimony would have been less than convincing when more immediate family members were not called to testify).  Thus, the parts of Matthew's testimony that the Arkansas Supreme Court termed cumulative reasonably might have had a greater impact than mitigating testimony from other witnesses.

The Arkansas Supreme Court's third reason was that the State could have impeached Matthew by introducing evidence that the family was living in a shelter at the time of the murder and that the Department of Human Services had a case file on the family because of past issues.  The court did not explain why this information would have been used to impeach Matthew's testimony but not that of other witnesses who testified that Springs had been a good father.  *See* Ark. R. Evid. 607-609.  More importantly, since the jury was aware of Springs' threats against Christina, her fear for her life, and the fact that Christina and the children were living in a crisis center prior to the murder, it is difficult to see what additional damage to Springs' case this evidence would have done.

In his opening statement at trial, the prosecutor explained:

> Christina had been staying at the Crisis Center for Women here in Fort Smith because it was the only place that she felt safe.  Her children stayed with her.
> . . . It was only the second day back from school after returning back from Tulsa because Christina had been sent to the Crisis Center in Tulsa.  She had been

sent to Tulsa because Thomas Springs had made a habit of driving around the Crisis Center here and caused alarm.

Kelly Repking testified:

> Q.    Did Christina stay at the Crisis Center continually from December 21st until January 21st?
> A.    She left at one point in time and they transported her to Tulsa.  When Thomas started circling the shelter they moved her to Tulsa and she came back to go to court on Tuesday for her divorce, two days before she died.

And Sue Travis testified:

> Q.    What did [Thomas Springs] say?
> A.    He just said that, I will kill her.  The kids are better off with neither parent if I can't have them, you know.  She don't deserve them, kind of things like that.
> Q.    How many times did he make comments like that?
> A.    He made that a lot of times to the point that I quit counting.

At the beginning of the penalty phase of Springs' trial, the judge instructed the jury, "In your deliberations on the sentence to be imposed, you may consider both the evidence that was presented in the first stage of the trial where you rendered a verdict on guilt and the evidence to be presented in this part of the trial."  Finally, Jacob's statement at the penalty phase of the trial also referenced that his brothers and sister lived in DHS housing, while he lived with his aunt and uncle because they adopted him from DHS.  Thus, that the family was living at a crisis center prior to the murder was already in evidence; and that the Department of Human Services had a case file on the family likely would have had little if any impact on the mitigating value of Matthew's testimony.

The Arkansas Supreme Court's fourth reason was that Springs' calling of Matthew to testify but not the other children may have "raised questions about the remaining children as to why none of them were willing to testify on their father's behalf."  *Springs II*, 2012 Ark. 87, at 11, 387 S.W.3d at 152.  If it might have raised questions for Springs to have one child, as opposed to all, testify on

his behalf, it may have raised even more questions to have one child testify on behalf of the State and none on behalf of their father.

In support of its reasoning, the Arkansas Supreme Court cited *Rankin v. State*, *supra*. In that case, the court indicated that calling the defendant's aunt to the stand to beg for the defendant's life, as opposed to calling the defendant's mother or brother, would have been less than convincing when those immediate family members were not called to testify. *Rankin*, 365 Ark. at 259-60, 227 S.W.3d at 928.[11] "Like *Rankin*, the question arises of how compelling Matthew's testimony would have been in light of the number of other children [Springs] had who did not testify on his behalf." *Springs II*, 2012 Ark. 87, at 11, 387 S.W.3d at 152. Rather than supporting the court's argument that Matthew's testimony would have lacked mitigating value, the *Rankin* opinion suggests that Matthew's testimony regarding his father's positive qualities, even those to which others had attested, could have had mitigating force. Stated another way, that none of his children testified that Springs was a good father and that they loved him may have raised questions or may have made the other mitigating witnesses' testimony less than convincing as to these qualities.[12]

---

[11] This ruling seems to have gone to the deficient performance part of the *Strickland* standard, not the prejudicial part. *See Rankin*, 365 Ark. at 260, 227 S.W.3d at 928.

[12] The court in *Springs II* also noted that the court in *Rankin* rejected the appellant's argument in part because "issues of an attorney's trial strategies or tactics were not to be debated in the Rule 37 forum." *Springs II*, 2012 Ark. 87, at 11, 387 S.W.3d at 152. To the extent that the court in *Springs II* is using this reasoning to support a lack of prejudice under *Strickland*, it is untenable. Whether reasonable professional judgments support counsel's choice to limit an investigation generally is an issue for the deficiency prong of the *Strickland* standard, not the prejudice prong. *See, e.g.*, *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. Moreover, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Springs' counsel did not investigate whether his children would testify on his behalf, and Springs' counsel could not remember having a conversation about whether to do so, which means that he did not make a reasonable decision, or any decision, that made such an investigation unnecessary. *Cf. Porter v. McCollum*, 558 U.S. at 39-40, 130 S. Ct. at 453.

The Arkansas Supreme Court also distinguished Springs' case from the United States Supreme Court's decision in *Wiggins*, *supra*, because Springs' case was not one "where counsel totally failed to investigate and put forth mitigation evidence." *Springs II*, 2012 Ark. 87, at 7, 387 S.W.3d at 150.[13]   The United States Supreme Court has "never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented." *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010).

Although these reasons for the court's conclusion as to prejudice seem flawed, the Arkansas Supreme Court's decision does not rest entirely upon them.   The court looked at the totality of the evidence and concluded that because the jury unanimously found three aggravating factors and that those factors outweighed the mitigating factors found by at least one juror but not all jurors, Springs had failed to demonstrate a reasonable probability that calling Matthew would have changed the outcome of the sentencing.  *Springs II*, 2012 Ark. 87, at 12-13, 387 S.W.3d at 152-53.  To assess the probability of a different outcome under *Strickland*, a court considers the available mitigation evidence from the trial and from the habeas proceeding and reweighs it against the evidence in aggravation.  *See Wiggins*, 539 U.S. at 534, 123 S. Ct. at 2542.  That standard applies "regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears*, 130 S. Ct. at 3266-67.  Moreover, that some of the state court's reasoning is faulty does not necessarily mean that the state court's decision involved an unreasonable application of the *Strickland* standard.  *See Williams v. Roper*, 695 F.3d 825, 837 (8th Cir. 2012).  The question is

---

[13] The Arkansas Supreme Court did not explicitly use this rationale as support for failing to find prejudice under *Strickland*, although no clear reason exists as to why the court would have distinguished *Wiggins* if not for support that no prejudice under *Strickland* existed in Springs' case.

whether the Arkansas Supreme Court reasonably could have concluded that Springs was not prejudiced by his lawyers' deficient performance.  *Id.* at 832.

In *Porter v. McCollum*, *supra*, the United State Supreme Court granted habeas relief to George Porter, holding that the Florida Supreme Court unreasonably concluded that, under the *Strickland* standard, Porter was not prejudiced by his counsel's deficiency in the penalty phase of his capital-murder trial.  *Porter*, 558 U.S. at 44, 130 S. Ct. at 455-56.  In that case, the jury and sentencing judge found four aggravating circumstances and no mitigating circumstances,[14] but on appeal the Florida Supreme Court found that the State had not carried its burden on one of the aggravating circumstances.  *Id.* at 32-33, 130 S. Ct. at 449.  The three remaining aggravating circumstances were: Porter had been previously convicted of another violent felony, the murder was committed during a burglary, and the murder was committed in a cold, calculated, and premeditated manner.  *See id.* at 32, 130 S. Ct. at 449.  The defense's mitigation evidence, which consisted of testimony from Porter's ex-wife and an excerpt of a deposition, included evidence that Porter had a good relationship with his son and inconsistent evidence regarding Porter's behavior when intoxicated.  *See id.*  The mitigating evidence that would have come in but for his counsel's deficiencies included testimony about his military service, his struggles when he returned from war, his childhood history of physical abuse, and brain damage that could manifest itself in impulsive, violent behavior.  *See id.* at 35, 41, 130 S. Ct. at 451, 454.

In *Terry Williams*, *supra*, the United States Supreme Court granted habeas relief to Terry Williams, holding that the Virginia Supreme Court unreasonably applied clearly established law in

---

[14] In Florida, the sentencing judge determines the existence and weight of aggravating and mitigating circumstances but must give great weight to the jury's verdict of life or death.  *See Porter*, 558 U.S. at 32, 130 S. Ct. at 449.

its decision that no prejudice would have existed as a result of counsel's alleged deficiencies at the sentencing phase of Williams's capital-murder trial. *See Terry Williams*, 529 U.S. at 397-99, 120 S. Ct. at 1515-16.  At Williams's sentencing hearing, the prosecution proved that Williams had been convicted of prior violent crimes, the jury found a probability of future dangerousness and unanimously fixed Williams's punishment at death, and the trial judge imposed the death sentence. *Id.* at 368-70, 120 S. Ct. at 1500-01; *see id.* at 418, 120 S. Ct. at 1526 (Rehnquist, C.J., dissenting) ("[T]he jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.").  Williams's mitigation evidence consisted of his mother's and neighbors' testimony that he was nice and not a violent person; recorded testimony of a psychiatrist who relayed Williams's statement that in the course of one of his robberies, Williams had removed bullets from his gun so as not to injure anyone; and his counsel's emphasis during cross-examination of prosecution witnesses that Williams had turned himself in to the police.  *Id.* at 369, 120 S. Ct. at 1500 (majority opinion).  Evidence that would have been adduced but for his lawyer's deficient performance included documents describing mistreatment, abuse, and neglect during Williams's childhood; testimony that Williams was "borderline mentally retarded" and had suffered head injuries; possible organic mental impairments; testimony from prison officials describing Williams's helpful acts and portraying him as nonviolent; and evidence that the experts who had testified on the State's behalf believed that Williams, if kept in a structured environment, would not pose a future danger to society.  *Id.* at 370-71, 120 S. Ct. at 1501; *see also Rompilla v. Beard*, 545 U.S. 374, 390-

93, 125 S. Ct. 2456, 2467-69, 162 L. Ed. 2d 360 (2005) (finding prejudice under *Strickland* at a capital-murder sentencing); *Wiggins*, 539 U.S. at 536, 123 S. Ct. at 2543 (same).

In other cases, the United States Supreme Court has denied habeas relief to death-row petitioners claiming ineffective assistance of counsel at the penalty phases of their trials.  In *Cullen v. Pinholster*, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Court found that the California Supreme Court did not unreasonably apply *Strickland* in holding that no prejudice occurred.  The State presented "extensive aggravating evidence": Pinholster had an extensive criminal history; he had threatened to kill the State's lead witness, assaulted a man with a razor, and kidnapped another using a knife; he had a history of violent outbursts; he had assaulted police officers; and he had an extensive list of violent actions while in different jails.  *See id.* at 1408.  The mitigating evidence that would have come in but for counsel's alleged deficiencies, however, duplicated mitigation evidence at trial or was of questionable mitigating value.  *See id.* at 1409-10.

In *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam), the Court held that the California Supreme Court's decision that no prejudice existed was not unreasonable.  The aggravating factors were "overwhelming":

> In the state court's judgment, the circumstances of the crime (a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery) coupled with the aggravating evidence of prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby) was devastating.

*Id.* at 26, 123 S. Ct. at 361; *see Schriro v. Landrigan*, 550 U.S. 465, 480-81, 127 S. Ct. 1933, 1943-44, 167 L. Ed. 2d 836 (2007) (holding that the district court did not abuse its discretion in finding that the petitioner was not prejudiced by his trial lawyer's failure to present evidence at the penalty phase where the "mitigation evidence was weak" and the petitioner had a very violent past); *see also*

*Wong v. Belmontes*, 558 U.S. 15, 27-28, 130 S. Ct. 383, 390-91 (2009) ("It becomes even harder to envision [how extra mitigating circumstances of expert testimony and of additional facts about Belmontes' difficult childhood would matter] when the evidence that Belmontes had committed another murder – "the most powerful imaginable aggravating evidence," as Judge Levi put it – is added to the mix." (citation omitted)).  The mitigating evidence at trial included expert testimony that the defendant had a minimal brain injury associated with impulse and learning disorders.  *See Woodford*, 537 U.S. at 25, 123 S. Ct. at 360.  The mitigating evidence that would have been adduced but for counsel's alleged deficiencies dealt with the defendant's background, including expert testimony that the defendant grew up in a dysfunctional family and suffered continual psychological abuse.  *Id.* at 26, 123 S. Ct. at 361.

The aggravating circumstances in Springs' case are more in line with those in *Porter* and *Terry Williams* than those in *Cullen* and *Woodford*, but the mitigating evidence that would have been adduced but for counsel's deficient performance in *Porter* and *Terry Williams* was more substantial than here.  Bearing in mind the deferential standard that applies, *see id*. at 27, 123 S. Ct. at 363, this Court cannot say that the Arkansas Supreme Court's conclusion on this issue was unreasonable.  The undisputed evidence proved that Springs had three prior convictions for battery in the second degree; that in the commission of the capital murder he knowingly created a great risk of death to two other persons, his sister-in-law and her three-year-old daughter; and that he committed the murder in an especially cruel or depraved manner.  While Matthew's testimony may have caused the jury to find additional mitigating factors, it was not unreasonable for the Arkansas Supreme Court to conclude

that Springs failed to demonstrate that a reasonable probability existed that the outcome of the sentencing would have been different if Matthew had testified.[15]

Point 3-1-12 asserts that Springs' lawyers were ineffective for soliciting and accepting from him a waiver regarding mitigation evidence, specifically the evidence that at times in years past his wife had used racially derogatory terms toward some of the children and had abused some of the children.  This issue was presented in Springs' Rule 37 petition and was rejected.  On appeal from the denial of his Rule 37 petition, Springs presented the following point:

> Springs' purported waiver of the right to present evidence about the deceased was not knowing and intelligent.  By not properly explaining it to Springs, trial counsel rendered ineffective assistance.

Respondent's Exhibit 8 at Argument 23.  As to the ineffective assistance of counsel portion of this claim, however, Springs' argument consisted of only one sentence: "Counsel was ineffective for failing to properly inform him of the strength of his claim to present this evidence."  *Id.* at Argument 25.  The Arkansas Supreme Court rejected this argument:

> Finally, to the extent that Appellant's challenge is an assertion of ineffective assistance of counsel, it is without merit.  In support of this claim, Appellant has presented nothing more than a conclusory allegation that counsel was ineffective in failing to properly inform him of the strength of his claim to present such evidence.  As we have explained, conclusory statements cannot be the basis of post-conviction relief.

*Springs II*, 2012 Ark. 87, at 24, 387 S.W.3d at 159 (citing *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783).  Thus, the Arkansas Supreme Court rejected the ineffective assistance of counsel component of this argument based upon an independent and adequate state procedural ground, i.e., that conclusory statements are insufficient for post-conviction relief.

---

[15] Reasonable jurists might disagree on this issue, so the Court will be inclined to grant a certificate of appealability on this issue if Springs later appeals or cross-appeals to the Eighth Circuit.

Springs' Issue 3-4 is that his trial lawyers were ineffective for failing to object to inflammatory and impermissible statements by the prosecutor during the penalty phase of the proceeding. A portion of this claim was presented in Springs' Rule 37 petition. The amended Rule 37 petition alleged that the prosecutor misstated the law and made an improper closing argument in his characterization of the mitigating circumstances presented by the defense. Respondent's Exhibit 12 at 191-92. Springs also presented this argument at some length on appeal. Respondent's Exhibit 8 at Argument 9-15.

The Arkansas Supreme Court upheld the circuit court in denying Rule 37 relief on this issue, explaining:

> Joplin admitted at the Rule 37 hearing that he did not object to the prosecutor's remarks, but would do so now in a capital case. Despite his failure to object, however, Joplin discussed the jury's role with regard to mitigating circumstances in his own closing argument. He stated in relevant part that the jury was to consider mitigating circumstances, that those mitigating circumstances did not have to be proved beyond a reasonable doubt, and that mitigation is "anything that supports less than the ultimate punishment of death." And, notably, at least one juror found the existence of four mitigating circumstances. Even though Joplin admitted that he did not object to the prosecutor's remarks, or offer a strategic basis for his failure to object, Appellant has failed to demonstrate that he was prejudiced as a result. A petitioner asserting ineffective assistance of counsel has the burden of proving that the prejudice resulting from an alleged error was real and had some demonstrable, detrimental effect and not some abstract or theoretical effect. *Kelley v. State*, 2011 Ark. 504, 2011 WL 5995530. Because Appellant cannot satisfy the prejudice prong of *Strickland*, the circuit court was correct to deny relief on this claim.

*Springs II*, 2012 Ark. 87, at 15-16, 387 S.W.3d at 154. This analysis is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor is it based on an unreasonable determination of the facts.

Springs' Issue 3-6 is that his trial lawyers were ineffective at the penalty phase because they failed to object to the presentation of allegations that Springs had threatened to "cut" a guard at the

Sebastian County Jail while being detained on the current charges.  On direct appeal, the Arkansas Supreme Court held that the three aggravating circumstances found by the jury were supported by the evidence.  *Springs I*, 368 Ark. at 265, 244 S.W.3d at 689.  No specific argument relating to the alleged threat to cut a jail guard was presented on direct appeal.

Springs argued during his Rule 37 proceedings that the evidence was insufficient to show that the alleged threat was a felony, which is a requirement for the particular aggravating circumstance submitted to the jury.  Respondent's Exhibit 8 at Argument 15-19 (citing Ark. Code Ann. § 5-4-604(3)).  The State contended that the threat constituted terroristic threatening in violation of Arkansas Code Annotated § 5-13-301.  In the decision affirming the denial of Rule 37 relief, the Arkansas Supreme Court held that the evidence was sufficient to show that this threat was a felony and that Springs had failed to show his lawyers were ineffective for failing to request an instruction to determine whether the incident constituted a felony or a misdemeanor or that he suffered prejudice.  *Springs II*, 2012 Ark. 87, at 19, 387 S.W.3d at 156.  This analysis by the Arkansas Supreme Court is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court; nor is it based on an unreasonable determination of the facts.

For his Issue 3-7, Springs contends that his lawyers were ineffective for failing to object to the introduction of written victim-impact statements during the penalty phase of his trial.  Several family members prepared written victim-impact statements, which they were permitted to read to the jury during their testimony and which were received into evidence as State's exhibits.  On direct appeal, the Arkansas Supreme Court held that victim-impact evidence was admissible.  *Springs I*, 368 Ark. at 271-72, 244 S.W.3d at 693-94. In the Rule 37 appeal, the court said that Springs had not

met his burden of showing that his lawyers' failure to object prejudiced him, "as his argument on this point is nothing more than a conclusory allegation that 'the inclusion of the statements as exhibits had the effect of unfairly emphasizing the evidence.'" *Springs II*, 2012 Ark. 87, at 20, 387 S.W.3d at 157.

Again, this analysis by the Arkansas Supreme Court is neither contrary to nor an unreasonable application of a clearly established federal law as determined by the United States Supreme Court; nor is it based on an unreasonable determination of the facts.

**D.      Claim 7**

Springs' seventh claim is a general claim that he was denied a fair adjudication of his sentence.  In support of that claim he asserts six issues and three points, some of which are duplicates of issues or points asserted elsewhere in his petition and which are therefore addressed elsewhere in this opinion.

In Issue 7-3, Springs argues that the trial court erred in failing to provide the jury with a verdict form that enumerated the specific mitigating factors upon which he relied.  Springs raised this issue on direct appeal, and the Arkansas Supreme Court rejected his argument on the merits. *Springs I*, 368 Ark. at 265-68, 244 S.W.3d at 689-91.

The trial court submitted Arkansas Model Criminal Instruction Form 2, which specifies six mitigating circumstances that the jury should consider.  *Id*. at 266, 244 S.W.3d at 690.  Springs requested an instruction form that specified eight mitigating circumstances: that he had performed deeds of service for Vivian O'Neill, that he had given encouragement to other people, that he had been a good employee of Whirlpool Corporation, that he had been a good employee of Arkansas Missouri Railroad, that he had been a good employee of J & V Manufacturing, that he had served

as a volunteer for Ragon Homes Youth Activities, that he had cooperated with law enforcement authorities by giving a confession to the murder, and that he cooperated further by assisting in allowing his home to be searched. *Id*. While the trial court rejected Springs' proffered form regarding mitigating factors, the court instructed the jury:

> If you do unanimously find one or more of those aggravating circumstances, you should then complete Form 2 which deals with mitigating circumstances. Form 2 lists some factors that you may consider as mitigating circumstances. However, you are not limited to that list. You may in your discretion find other mitigating circumstances. Form 2 is entitled mitigating circumstances.

*Id*. at 267, 244 S.W.3d at 691.

Springs contends that this method of submitting the mitigating circumstances to the jury is unconstitutional because it fails to provide for the jury "to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246, 127 S. Ct. 1654, 1664, 167 L. Ed. 2d 585 (2007); *see also Smith v. Texas*, 543 U.S. 37, 46, 125 S. Ct. 400, 406, 160 L. Ed. 2d 303 (2004); *Penry v. Lynaugh*, 492 U.S. 302, 321-24, 109 S. Ct. 2934, 2947-50, 106 L. Ed. 2d 256 (1989). Contrary to Springs' argument, those cases do not hold that the manner of submitting mitigating circumstances adopted by the State of Arkansas fails to provide an adequate vehicle for the jury to give meaningful consideration and effect to all of the mitigating evidence. In those cases, the United States Supreme Court held that the Texas procedure for submitting the death penalty to juries was unconstitutional because the jury was given verdict forms that only permitted them to answer questions regarding the existence or not of aggravating circumstances. Here, however, the jury was instructed that it could consider any mitigating circumstances that probably existed. The jury also had to find unanimously that the aggravating circumstances outweighed beyond a

reasonable doubt any mitigating circumstances found by any juror to exist.  This procedure is designed to ensure that the jury gives meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty.  Therefore, the Arkansas Supreme Court's rejection of Springs' claim regarding the verdict form is neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Springs contends that he presented Issue 7-4 on direct appeal.  In Issue 7-4 Springs argues that the trial court erred by failing to provide him with notice of the aggravating factors that would be used against him and by using a verdict form that included factors for which there was no evidentiary basis.  The first portion of this issue – that he was not given notice of the aggravating factors that would be used against him – has never been presented to the Arkansas courts.  The second part – that the verdict form included aggravating factors for which no evidence was presented – was raised on direct appeal.

On direct appeal Springs argued that the trial court erred by submitting the third and fourth aggravating factors – that the capital murder was committed for the purpose of avoiding arrest or escaping from custody, and the capital murder was for pecuniary gain – because no evidence was offered that would support those aggravating factors.  The Arkansas Supreme Court refused to decide the merits of this issue, stating:

> Here, Appellant moved to dismiss all of the aggravating circumstances for insufficient evidence.  A motion to dismiss is identical to a motion for a directed verdict in a jury trial and is a challenge to the sufficiency of the evidence.  *See Reed v. State*, 91 Ark. App. 267, 209 S.W.3d 449 (2005).  However, a motion for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient.  *Banks v. State*, 354 Ark. 404, 125 S.W.3d 147 (2003).  Here, Appellant made a broad objection to all aggravating circumstances through his motions to dismiss for lack of evidence.  None of Appellant's objections specified the respect

> in which the evidence was deficient nor did they specify either of the two aggravating circumstances now before us on appeal.  As such, Appellant has failed to preserve this argument for review.

*Springs I*, 368, Ark. at 264, 244 S.W.3d at 689.  Thus, the Arkansas Supreme Court decided this issue based upon an independent and adequate state procedural ground.

### E.    Claim 12

Springs' twelfth claim alleges the death penalty violates the Eighth Amendment.  Springs fails to cite any statutory or case law to support his argument.  Furthermore, the Eighth Circuit Court of Appeals has found that the Arkansas death penalty statute does not violate the Eighth Amendment *Singleton v. Lockhart*, 962 F.2d 1315, 1323 (8th Cir. 1992).

### F.    Claim 13

Springs' final claim alleges the Court should conduct a cumulative assessment of whether constitutional errors occurred and whether such errors were prejudicial.  The Eighth Circuit has rejected the notion that habeas relief may be based on cumulative errors:

> We repeatedly have recognized "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002) (citation omitted); *see, e.g.*, *United States v. Robinson*, 301 F.3d 923, 925 n.3 (8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)).

*Middleton v. Roper*, 455 F.3d  838, 851 (8th Cir. 2006).

51

### Conclusion as to the Grounds for Relief
### that Springs has Presented to the State Courts

Springs fairly presented Point 1-1-5, Point 2-1-9, Point 3-1-11 (as to Matthew Mooring), Issue 3-4, Issue 3-6, Issue 3-7, Issue 7-3, Claim 12, and Claim 13 to the state courts.  As to none of these grounds for relief was the decision of the Arkansas Supreme Court contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; nor was the decision of the Arkansas Supreme Court based on an unreasonable determination of the facts as to any of these issues.  Springs also presented Point 3-1-12 and Issue 7-4 (submitting aggravating factors for which there was no evidence), but the Arkansas Supreme Court decided those matters on independent and adequate state grounds.  Point 3-1-12 and Issue 7-4 are procedurally defaulted as Springs has failed to show that the procedural rules upon which the decisions on those arguments were based are not strictly and regularly followed.

### V.  GROUNDS FOR RELIEF THAT
### SPRINGS HAS NOT PRESENTED TO THE STATE COURTS

Arkansas provides for postconviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure.  Rule 37.1 authorizes relief for a person in custody whose sentence was imposed in violation of the state or federal constitution, if the sentencing court was without jurisdiction, if the sentence exceeds the legal maximum, or if the sentence is otherwise subject to collateral attack.  Ark. R. Crim. P. 37.1(a).  Rule 37.2 provides, "All grounds for relief available to a petitioner under this rule must be raised in his or her original petition unless the petition was denied without prejudice." Ark. R. Crim. P. 37.2(b).  "Any ground not so raised . . . may not be the basis for a subsequent petition." *Id*.  Even in capital cases, the Arkansas Supreme Court applies this rule to bar subsequent petitions where the original petition was not dismissed without prejudice.

*See, e.g., Moss v. State*, 2013 Ark. 512, at 2 (per curiam) ("Regardless of the label placed on it by the petitioner, a pleading that mounts an attack on a judgment based on claims within the purview of Rule 37.1 is governed by that rule. . . .  When appellant's Rule 37.1 petition was denied by this court in 2010, he was not granted leave to file a subsequent petition.  Accordingly, he is not entitled to proceed again for postconviction relief.").  Springs' Rule 37 petition was not dismissed without prejudice, so the State contends that all of his grounds for relief that were not included in that petition or raised on direct appeal are procedurally barred.

Springs disagrees.  First, Springs argues that those grounds for relief are not defaulted because procedures remain pursuant to which he may still be entitled to present them to the state courts.  Accordingly, he requests this Court to stay his petition and hold it in abeyance while he returns to state court to present his claims there.  In the alternative, Springs contends that even if some or all of his grounds for relief are procedurally defaulted, he can establish cause and prejudice for any procedural default.  Thirdly, as mentioned above, Springs contends that he is actually innocent of capital murder by virtue of his mental condition.

## A.      Stay and Abey

The Eighth Circuit has explained:

> A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim.  If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default.  If a federal court is unsure whether a claim would be rejected by the state courts, the habeas proceeding should be dismissed without prejudice or stayed while the claim is fairly presented to them.  If, however, it is clear that the state courts would find the claim to be procedurally barred and that a return to the state courts would be futile, the federal court may consider an unexhausted claim.  A petitioner could then try to overcome any procedural default by showing cause or actual prejudice.

*Sloan v. Delo*, 54 F.3d 1371, 1381-82 (8th Cir. 1995) (citations omitted).

53

Because dismissing unexhausted claims may result in the expiration of the statute of limitations provided in 28 U.S.C. § 2244(d)(1), the Supreme Court has recognized that a district court may stay a section 2254 petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims. *Rhines v. Weber*, 544 U.S. 269, 275, 125 S. Ct. 1528, 1534, 161 L. Ed. 2d 440 (2005). The Court has recognized, though, that the stay and abey procedure, if employed too frequently, could undermine AEDPA's purposes of reducing delays in the execution of sentences and encouraging petitioners to seek relief from state courts in the first instance. *Id*. at 276-77, 125 S. Ct. at 1534. "For these reasons, stay and abeyance should be available only in limited circumstances." *Id*. at 277, 125 S. Ct. at 1535. District courts may employ this procedure only if there is good cause for a petitioner's failure to exhaust his claims, the unexhausted claims are not "plainly meritless," and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. *Id*. at 277-78, 125 S. Ct. at 1535. If this procedure is employed, the district court "should place reasonable time limits on a petitioner's trip to state court and back." *Id*. at 278, 125 S. Ct. at 1535.

Springs contends that relief remains available to him in the state courts by means of a petition for writ of habeas corpus, a petition for writ of coram nobis, or by means of a motion to recall the mandate. The scope of each of these remedies is quite limited.

## 1.     *Writ of Habeas Corpus*

In Arkansas, "a writ of habeas corpus will only be issued if the commitment was invalid on its face, or the sentencing court lacked jurisdiction." *Flowers v. Norris*, 347 Ark. 760, 763, 68 S.W.3d 289, 291 (2002). Allegations of trial error, including alleged violations of due process and equal protection, do not implicate the facial validity of the judgment or the jurisdiction of the trial

court and therefore cannot be raised in a habeas petition.  *Chamblis v. State*, 2014 Ark. 188, at 3.  "A habeas-corpus proceeding does not afford a prisoner a means to revisit the merits of matters that could have been addressed in the trial court, on appeal, or in a postconviction proceeding."  *Jones v. State*, 2014 Ark. 67, at 4.  Likewise, allegations of ineffective assistance of counsel are not cognizable in a habeas proceeding; rather, claims concerning counsel's effectiveness must be raised in a Rule 37 petition.  *Id*. at 4-5; *see also Davis v. State*, 2014 Ark. 128, at 2.  Arkansas has also provided by statute for the writ of habeas corpus to issue when a person convicted of a crime can show by newly obtained scientific evidence that he is actually innocent.  Ark. Code Ann. § 16-112-201 *et seq*.

Springs does not claim that he is actually innocent by virtue of newly discovered scientific evidence, nor does he challenge the jurisdiction of the circuit court or the facial validity of the judgment and commitment order.  Therefore, it would be futile for him to petition the Arkansas courts for a writ of habeas corpus.

Springs cites *Jackson v. Norris*, 2013 Ark. 175, for the proposition that the writ of habeas corpus is a state-law remedy that remains available to him.  Jackson was a juvenile who was convicted of capital murder and subjected to a mandatory sentence of life imprisonment.  After his convictions and sentences were affirmed on direct appeal, he filed a petition for writ of habeas corpus, which the trial court denied.  The Arkansas Supreme Court affirmed the denial of the writ.  The Supreme Court of the United States granted certiorari and reversed and remanded *sub nom. Miller v. Alabama*, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).  When it granted the writ in Jackson's case, the Arkansas Supreme Court was following the mandate of the United States Supreme Court.  No similar circumstance exists here.

2. ***Writ of Error Coram Nobis***

Springs also contends that he could obtain relief through a petition for writ of error coram nobis.  "A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval."  *Newman v. State*, 2009 Ark. 539, at 4, 354 S.W.3d 61, 65.

> Coram nobis proceedings are attended by a strong presumption that the judgment of conviction is valid.  The function of the writ is to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition if it had been known to the circuit court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment.

*Id*. at 5, 354 S.W.3d at 65.  Therefore, "[t]o warrant a writ of error coram nobis, the petition must present some fact, extrinsic to the record, that was not known at the time of trial."  *Sparks v. State*, 2012 Ark. 464, at 2.  In Arkansas a writ of error coram nobis is available to address errors in four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third party confession to the crime during the time between conviction and appeal. *Newman*, 2009 Ark. 539, at 5, 354 S.W.3d at 65.  The petitioner must exercise due diligence in applying for relief, which means that he must have been unaware of the fact at the time of trial, he could not have presented the fact at trial, and after discovering the fact, he did not delay in bringing the petition.  *Id*. at 5-6, 354 S.W.3d at 65.

A circuit court may entertain such a petition only after the Arkansas Supreme Court grants permission.  *Sparks*, 2012 Ark. 464, at 2.  The Arkansas Supreme Court will grant permission "only when it appears the proposed attack on the judgment is meritorious."  *Id*.  In determining whether the proposed attack appears to be meritorious, the court looks to "the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof."  *Newman*, 2009 Ark. 539, at 5, 354 S.W.3d at 65.  "The burden is on the petitioner to show that the writ is

warranted, and a bare assertion with no factual support does not justify reinvesting jurisdiction in the circuit court to consider a petition for writ of error coram nobis." *Pitts v. State*, 2014 Ark. 132, at 4. Allegations of ineffective assistance of counsel are not grounds for the issuance of the writ of error coram nobis. *Nelson v. State*, 2014 Ark. 91, at 5. "Moreover, we have repeatedly held that allegations made in support of error coram nobis that are premised on ineffective-assistance-of-counsel claims are not cognizable in error coram nobis proceedings." *Id*.

The only ground for relief that Springs asserts that falls within one of the categories recognized as a basis for error coram nobis relief in Arkansas is his claim that he was incompetent at trial. Springs cites *Newman* for the proposition that the writ of error coram nobis is a potential remedy that may be available to him in state court. Newman was convicted of capital murder and sentenced to death. He attempted to waive a direct appeal of his conviction, but pursuant to Rule 10 of the Arkansas Rules of Appellate Procedure–Criminal, the Arkansas Supreme Court conducted an automatic review and affirmed his conviction and sentence. After the mandate was issued, the circuit court conducted a hearing to consider the appointment of counsel to represent Newman in postconviction proceedings. Newman chose to waive his right to representation, and the circuit court concluded that he was competent to do so. The Arkansas Supreme Court remanded for the purpose of having Newman evaluated to determine whether he was competent. On remand, Newman was examined by a psychologist from the Arkansas State Hospital, who concluded that he was competent. The circuit court then held that Newman was competent, and the Arkansas Supreme Court affirmed.

Newman later filed a federal habeas petition in the Western District of Arkansas. At a hearing on the issue of whether the statute of limitations should be equitably tolled, the psychologist

who had examined Newman testified that he had used an improper test to determine Newman's competency, improperly administered Newman's tests, and incorrectly scored the test that he administered to Newman. *Newman*, 2009 Ark. 539, at 3, 354 S.W.3d at 64. Because this evidence, and other newly discovered evidence, had not been presented to the Arkansas courts, the district court concluded that the Arkansas courts should have the opportunity to address them, so the district court stayed Newman's section 2254 petition. *Newman v. Norris*, 597 F. Supp. 2d 890, 896-97 (W.D. Ark. 2009).

Newman then petitioned the Arkansas Supreme Court to reinvest jurisdiction in the circuit court for the purpose of determining whether he was entitled to the writ of error coram nobis, and with that petition he presented the testimony of the psychologist regarding the errors that had been made in determining competency. *Newman*, 2009 Ark. 539, at 3, 354 S.W.3d at 64. Newman also presented evidence from a psychiatrist and a neuro-psychiatrist regarding his psychological condition, which he supported with medical reports and declarations from family members. *Id*. at 7, 354 S.W.3d at 65-66.

Springs alleges that there is a history of mental illness in his family, that he suffered a head injury in his youth, and that he had been diagnosed with post-traumatic stress disorder in 1997. In addition, Springs quotes records from the Arkansas Department of Correction indicating that during his incarceration for the offense under consideration here he has made comments and engaged in behavior indicative of a psychosis. Unlike *Newman*, however, Springs has neither presented evidence that Dr. Deyoub has recanted his testimony nor offered evidence from a psychiatrist or neuro-psychologist to show that at the time of trial he had impairments so severe that he was incompetent.

Absent such evidence, the Arkansas Supreme Court has not granted a motion to invest a trial

court with jurisdiction to conduct error coram nobis proceedings based on a claim that the defendant

was incompetent at trial. In *Hooper v. Arkansas*, 2014 Ark. 16 (per curiam), for instance, the

petitioner alleged that he was incompetent at trial and that his intellectual functioning was impaired

due to a gunshot wound to the head. In denying the motion to reinvest jurisdiction in the circuit

court, the Arkansas Supreme Court explained:

> Prior to trial, petitioner was examined by a psychiatrist pursuant to a motion filed by the defense. The psychiatrist diagnosed him with drug and alcohol dependency and anti-social personality. The psychiatrist further concluded that petitioner did not have a mental disease or defect when he committed the crimes, did not lack the capacity to appreciate the criminality of his conduct, and did not lack the capacity to conform his conduct to the requirements of the law. While petitioner alleges that his attorney failed to provide the doctor with medical records concerning the head injury, the matter was discussed at a pretrial hearing. At that time, the trial court declined to grant a continuance to allow petitioner to obtain the records to be submitted to the doctor.
>
> Petitioner has presented nothing in his coram-nobis petition to demonstrate that there would have been a different outcome to the trial had the doctor had the medical records. The doctor determined that the petitioner was competent at the time of the defense and at the time of trial. Petitioner has not shown that any particular information in the medical report would have caused the doctor to reach a different conclusion. Moreover, while insanity at the time of trial is a ground for the writ, the burden is on the petitioner who claims a history of mental defect or illness to overcome the strong presumption that the judgment was valid. The mere fact that petitioner may have had a head injury before the psychiatrist examined him is not sufficient to warrant issuance of the writ.

*Id*. at 3-4; *see also Whitham v. State*, 2011 Ark. 28 (denying a coram nobis petition because the

claim was unsupported by factual substantiation to show that the petitioner was insane at the time

of trial); *Webb v. State*, 2009 Ark. 550 (denying a motion to reinvest the trial court with jurisdiction

because the petitioner was not likely to carry his burden to show that he was incompetent to stand

trial); *Maxwell v. State*, 2009 Ark. 309 (denying a coram nobis petition where the petitioner had

undergone a mental health examination before trial, which found him competent); *Haywood v. State*, No. CR07-742, 2008 WL 95866 (Ark. Jan. 10, 2008) (denying a coram nobis petition where the petitioner presented no evidence in support of his claim of mental illness other than bare allegations); *Heffernan v. State*, No. CR81-82, 2007 WL 538999 (Ark. Feb. 22, 2007) (denying a coram nobis petition where no evidence was presented to support the claims of insanity at the time of trial).

Bearing in mind that whether a state remedy is presently available is a question of state law as to which only the state courts may speak with final authority, still, as the record presently stands, it seems highly unlikely that the Arkansas Supreme Court would determine that the proposed attack on the judgment appears to be meritorious and would therefore reinvest the circuit court with jurisdiction to hear a coram nobis petition.  Here, as noted, Springs was examined by a psychologist before trial, at state expense; and during his Rule 37 proceedings, his lawyer was provided funds to hire a psychiatrist, a neurologist, and a neuro-psychiatrist.  In both instances—before trial and before the Rule 37 hearing—after receiving the assessments by mental health professionals, Springs' lawyers decided not to pursue claims that he was incompetent or insane.  Springs can obtain relief now only if his lawyers, both at trial and in his Rule 37 proceedings, were ineffective when they decided not to pursue claims that he was incompetent or insane.  But, as noted, claims that are predicated on ineffective assistance of counsel are not cognizable in error coram nobis proceedings.  Consequently, it would be futile to stay these proceedings to enable Springs to return to state court for the purpose of seeking a writ of error coram nobis.

3.      *Motion to Recall the Mandate*

Springs contends that one other state-law remedy remains available to him, i.e., a motion to recall the mandate.  In *Robbins v. State*, 355 Ark. 556, 114 S.W.3d 217 (2003), the Arkansas Supreme Court granted a motion to recall the mandate in a capital murder case after the defendant's conviction and sentence had been affirmed on direct appeal, and his Rule 37 petition had been denied by the circuit court on appeal.  In that case, the jury had erred in completing the sentencing verdict forms.  In another case, the Arkansas Supreme Court had held that such an error required resentencing, but the error had been overlooked in Robbins' case.  The Arkansas Supreme Court granted the motion to recall the mandate (1) because of the error that had been overlooked in previous proceedings on appeal, (2) because a federal district court had dismissed the federal habeas petition to give the state courts an opportunity to review the issue, and (3) because the court requires enhanced scrutiny in death cases.  *Id*. at 565, 114 S.W.3d at 223.

These reasons for recalling the mandate in Robbins subsequently became a three-fold inquiry into what have become known as the *Robbins* factors.  The Arkansas Supreme Court will recall its mandate from direct appeal or Rule 37 proceedings if three factors are met: (1) the presence of a defect in the appellate process; (2) habeas proceedings in federal court are dismissed because of unexhausted state-court claims; and (3) the case is a death case that requires heightened scrutiny. *Wooten v. State*, 2010 Ark. 467, at 7, 370 S.W.3d 475, 479.

In two opinions handed down on February 14, 2013, regarding the same death row inmate, the Arkansas Supreme Court granted a motion to recall the mandate in one case but denied it in the other. *Roberts v. State*, 2013 Ark. 57; *Roberts v. State*, 2013 Ark. 56.  These two cases illustrate the court's application of the *Robbins* factors.  In 2013 Ark. 57, the Arkansas Supreme Court granted

the motion to withdraw the mandate, holding that the three *Robbins* factors were met. *Roberts*, 2013 Ark. 57, at 7.  In that case, the court said that it was clear that Roberts met two of the three factors, i.e., he was sentenced to death and his federal habeas petition had been stayed and held in abeyance. *Id*. at 7-8. The court then turned to the third factor, whether there was a defect in the appellate process, and determined that there had been a defect before granting the motion to withdraw the mandate.  *Id*.  In the other opinion, the Arkansas Supreme Court denied the motion, explaining that although Roberts had been sentenced to death and his federal-court proceedings had been stayed, he had not demonstrated that there was a defect in the appellate process that warranted recall of the mandate.  2013 Ark. 56, at 9.

Here, Springs has pointed to nothing that would constitute a breakdown in the appellate process that might cause the Arkansas Supreme Court to recall its mandate from his earlier direct appeal or Rule 37 appeal.  Therefore, it would be futile to stay these proceedings to permit him to file a motion in the Arkansas Supreme Court requesting that court to recall its earlier mandate in his direct appeal or in his Rule 37 appeal.

### Conclusion as to the Grounds for Relief
### that Springs has not Presented to the State Courts

For the reasons stated, Springs has no non-futile remedies available in state court.  Therefore, all of his claims that have never been presented to the state courts are procedurally defaulted.

## VI.  CAUSE AND PREJUDICE

Procedural default does not always bar federal habeas review.  The rule is:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

62

*Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565.[16]  In other words, when

> no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default' (or actual innocence . . . ).

*Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996)).[17]

Negligence by the lawyer representing a prisoner in his state post-conviction proceedings generally is not a "cause" that will excuse a procedural default.  *Maples v. Thomas*, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012).  But where state law requires that claims of ineffective assistance of trial counsel be raised in an initial-review collateral proceeding, or where the state procedural framework, by reason of its design and operation, makes it unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct

---

[16] Springs argues that he is not required to show cause and prejudice for claims of "structural error" that have not been presented to the state courts, but he acknowledges that the Eighth Circuit has held that "a finding of structural error does not obviate a petitioner's obligation to show prejudice when attempting to overcome a state procedural default." *Hunt v. Houston*, 563 F.3d 695, 704 n.2 (8th Cir. 2009).

[17] Springs contends that his incompetency claim is not subject to the procedural default rule, so he need not establish cause and prejudice to proceed on that claim.  In support of that argument, he relies upon *Vogt v. United States*, 88 F.3d 587, 590 (8th Cir. 1996).  That decision is a panel decision that appears to be in conflict with an earlier panel decision of the Eighth Circuit, *Wright v. Lockhart*, 914 F.2d 1093, 1101-02 (8th Cir. 1990).  *Compare Ryan v. Kenney*, 125 F. Supp. 2d 1149, 1150-51 (D. Neb. 2000) (holding that *Vogt* "must be viewed as an aberration rather than as established precedent in this Circuit" because it is contrary to decisions of the Eighth Circuit before and after *Vogt* was decided), *with United States v. Pedroza*, No. 4:03CR3170, 2006 WL 1134910, at *6 n.5 (D. Neb. April 26, 2006) ("While this holding may be in doubt, *see Ryan v. Kenney* . . . , *Vogt* has not been overruled and I must therefore follow that decision.").  For reasons that will be explained, Springs is entitled to an evidentiary hearing on his competency claims, so the Court need not decide whether *Vogt* is binding precedent in this circuit.

appeal, a procedural default will not bar a federal court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no lawyer or the lawyer in that proceeding was ineffective. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921, 185 L. Ed. 2d 1044 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272 (2012); *Sasser v. Hobbs*, 735 F.3d 833, 851-53 (8th Cir. 2013).

"To demonstrate prejudice, [the petitioner] must show a reasonable probability that, but for the alleged constitutional violations, the result of the proceeding would have been different." *Hunt*, 563 F.3d at 704. For many of Springs' defaulted claims he cannot show prejudice because the nature of the evidence against him is such that he cannot show a reasonable probability that the result of the proceeding would have been different.

Springs committed the murder of which he was convicted at nine in the morning at a busy intersection in front of a large number of eyewitnesses. He cannot show, and does not argue, that he did not kill his estranged wife. He deliberately rammed his car into the vehicle in which she was a passenger, repeatedly banged her head against the dash, and repeatedly stabbed her, leaving stab wounds on her back, her chest, both of her arms, and both of her legs. Springs had stated numerous times that if she ever left him he would kill her. He repeated that threat on several occasions after she left him, including on the morning of the murder. Thus, overwhelming evidence supported the jury's conclusion that Springs acted with the premeditated and deliberated purpose of causing Christina's death.

The evidence supporting the jury's finding of the aggravating factors at the penalty phase was equally strong. The undisputed evidence established that Springs had three prior convictions for battery in the second degree; that in the commission of the capital murder Springs knowingly

created a great risk of death to two other persons, i.e., the two other persons in the vehicle that he deliberately rammed with his vehicle; and that he committed the murder in an especially cruel or depraved manner.

In view of the strength of the evidence against Springs on the elements of capital murder and the aggravating factors supporting the conclusion that Springs should be sentenced to death, the only alleged constitutional violations for which Springs might be able to establish prejudice, i.e., a reasonable probability that but for the violations the result of the proceeding would have been different, are his claims pertaining to his alleged mental illness.  If Springs could prove that he was incompetent at trial, that might establish prejudice.  If Springs could prove that he lacked the mental capacity to act with a premeditated and deliberated purpose, that would negate the *scienter* element required for capital murder in Arkansas.  If Springs could prove that he lacked the mental capacity, as a result of mental disease or defect, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct, that would cause the result of the proceeding to be different.[18]  And, failing all of that, Springs might be able to prove that his mental illness was such that it is reasonably probable that the jury would have concluded at the penalty phase that the aggravating circumstances did not outweigh the mitigating circumstances beyond a reasonable doubt.  Thus, the allegations in Springs' petition, if proven, might establish that he was incompetent to stand trial; that he lacked the mental capacity to act with a premeditated and deliberated purpose; that he lacked the capacity, as a result of mental disease or defect, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct; or that the penalty should be life imprisonment, rather than death, because of the extent of his mental illness.

---

[18] *See* Ark. Code Ann. § 5-2-313.

According to his petition, Springs has a long history of mental illness and traumatic brain injury.  When he was eight years of age, his head was crushed by the tailgate of his father's pickup, causing permanent brain damage.  After the head injury, he was sent to a treatment center for children with severe mental or emotional difficulties, where he was forced to endure long periods of solitary confinement and sensory deprivation in a "quiet room" and was placed in a strait-jacket. In addition, Springs was a victim of severe and unrelenting emotional and physical abuse, which is described in some detail in the petition.  As a result of those traumas, Springs developed complex post-traumatic stress disorder.  He continued to exhibit symptoms of psychological disorders as an adult, including auditory hallucinations, obsession with delusional thought patterns, paranoia and fear of persecution, manic episodes, and bouts of disabling depression.  The petition quotes numerous statements from records of the Arkansas Department of Correction that could indicate that Springs has a psychosis of some kind.

Springs alleges in his petition that Dr. Deyoub found him competent because his examination was too brief inasmuch as it lasted no more than two hours.  The order directing that Springs be evaluated called for a full forensic examination and observation to be conducted at the Arkansas State Hospital for a period of not more than thirty days, or such longer period as the director of mental health services or his designee determined to be necessary.  Such an examination and observation never took place.  A secretary for the prosecutor wrote the Department of Human Services, Division of Mental Health Services, stating that the court had ordered the defendant to submit to a one-day psychiatric evaluation, which was inaccurate.  According to Springs' petition, if the court order had been followed, he would have been committed to the Arkansas State Hospital for a sufficient period of time to enable psychiatrists to conduct a more thorough examination, which

would have produced evidence of his insanity.  Thus, Springs' allegations regarding his mental condition, if proven, might establish the necessary prejudice to enable federal habeas review of those claims on the merits.

Springs contends that his public defenders, Joplin and Haaser, were ineffective when they failed to move for a hearing on competency, when they failed to object to the violation of the court's order regarding the psychological evaluation, when they failed to hire an independent psychological examiner, when they failed to renew the motion for appointment of an expert to examine Springs for brain injury, and when they failed to provide Dr. Deyoub with relevant information regarding his psychiatric history.  Similarly, Springs alleges that Joplin and Haaser were ineffective at the penalty phase because they failed to present evidence of his psychiatric disorders and the brain damage and abuse that gave rise to them.

Although Springs did not present these claims in his Rule 37 proceeding, he contends that his failure to do so was the result of the ineffectiveness of Rosenzweig, who represented him during those proceedings.  *Martinez*, *Trevino*, and *Sasser* have opened the door to such claims.  In *Sasser*, the Eighth Circuit reversed the district court's denial of Sasser's request for an evidentiary hearing.  *Sasser*, 735 F.3d at 854.  In light of *Sasser*, Springs is entitled to an evidentiary hearing on the question of whether he has a substantial claim of ineffective assistance of counsel at trial and during the penalty phase on the claims mentioned above and on the issue of whether Rosenzweig was ineffective during Springs' Rule 37 proceedings for failing to pursue a claim pertaining to his mental illness.  Because Springs' allegations regarding his trial lawyers' failure to call Chantelle at sentencing and Rosenzweig's failure to call her at the Rule 37 hearing also relate to potential

mitigation evidence and to Springs' mental condition, the evidentiary hearing will include those issues.[19]

## CONCLUSION

The Court will conduct an evidentiary hearing as described above. The parties must consult concerning what discovery, if any, may be appropriate pursuant to Rule 6 of the Rules Governing Section 2254 Proceedings and submit to the Court a report explaining the discovery each party requests, the "good cause" for the discovery, whether the opposing party objects, the date by which discovery should be concluded, any proposed dates for expert reports to be disclosed, and other deadlines that may be needed to facilitate orderly preparation for the evidentiary hearing. The report should include an estimate of the length of time needed for the evidentiary hearing. If possible, the parties should submit a joint report. If, however, the parties are unable to agree on important matters, they may submit separate reports. The report (or, if necessary, the reports) must be submitted within thirty days from the entry of this Opinion and Order. After receiving and reviewing the report (or reports), the Court will issue a scheduling order, which will include a date for the evidentiary hearing.

Springs' motion for judgment on the pleadings is DENIED. Document #21.

IT IS SO ORDERED this 23rd day of June, 2014.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[19] Joshua's statement had little mitigating value, so Springs has no substantial claim of ineffective assistance based on his trial lawyers' failure to call Joshua, nor was Rosenzweig ineffective for failing to present the issue in the Rule 37 petition.