IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

CAPITAL CASE

THOMAS LEO SPRINGS                                              PETITIONER

v.                          CASE NO. 5:13-CV-00005 BSM

WENDY KELLEY, Director,
Arkansas Department of Correction                              RESPONDENT

ORDER

Thomas Springs's petition for a writ of habeas corpus [Doc. No. 1] is denied. Springs

is a death row inmate who has exhausted all of his state remedies and is being held in the

Arkansas Department of Correction for the murder of his wife, Christina Springs.

I. BACKGROUND

A.    The Conviction

Springs murdered Christina at the busy intersection of Greenwood Avenue and Rogers

Avenue in Fort Smith, Arkansas. Doc. No. 29. Springs and Christina had a twenty-year

relationship and six children together. Christina took the couple's five youngest children and

moved into a crisis center one month before the murder. This upset Springs, and he repeatedly

threatened to kill her. After Springs was seen stalking the center, Christina and the children

were transferred to a crisis center in Tulsa, Oklahoma.

Four days before her murder, Christina and the children were in Fort Smith so

Christina could attend a hearing on her petition for an order of protection that she had filed

against Springs. On the morning of the murder, Springs went to the elementary school attended

by his three youngest children and attempted to see them. A police officer stopped Springs

from seeing his children, so he went to a parking lot across the street from the school and waited.  He told another parent that he was going to kill Christina.

When Christina was notified of Springs's attempt to see the children, she rode to the school with her sister and her three-year old niece, where she spoke with the police officer. While Christina spoke with the officer, Springs remained across the street, screaming obscenities at Christina and yelling that he wanted to see his children.  The police escorted Christina, her sister, and her niece from the school.

The car occupied by Christina, her sister, and her niece drove away from the school, and when it stopped at the intersection of Greenwood Street and Rogers Avenue, Springs rammed his vehicle head-on into it.  Springs got out of his car and attacked Christina.  He punched through her window, beat her face, and slammed her head into the dashboard.  He then returned to his car, retrieved a knife, and repeatedly stabbed her.  While butchering Christina, he yelled "die, bitch, die."  Trial R. 1468, 1486, Resp't Ex. 5, Doc. No. 10-5.

As Christina attempted to escape, she begged Springs to stop and told him that he could see the children.  Bystanders eventually subdued Springs, but not before he made good on his threats to kill his wife.  Christina died from blunt-force head injury and multiple stab and cutting wounds.

B.     Procedural History

*1. The Trial*

2

Springs was charged with capital murder and two counts of aggravated assault. His trial lawyers were the Sebastian County chief public defender, John Joplin, and his deputy, Cash Haaser. Haaser handled the guilt phase of the trial, and Joplin handled the penalty phase. Joplin had been second chair on a capital case the year before, but Haaser had never participated in a capital case. Both attended continuing legal education courses on capital cases. Joplin went to a capital-defense training program while preparing for Springs's trial. Joplin led the investigation and had a reputation for being hard-working and thorough. He was known for weighing various trial strategies by seeking the opinions of outside counsel and asking staff members to think like jurors.

There were distractions for both lawyers. Joplin had recently been appointed as the district's chief public defender and had new administrative duties, along with a heavy caseload. Haaser's caseload included 100 to 150 circuit court cases. Haaser was also, understandably, distracted by the collapse of his teenage son, who was hospitalized in May 2005 for seven weeks. Haaser was raising his son as a single parent and had to be out of the office while his son was in the hospital. His son's follow-up appointments also took up a lot of his time.

Mark Harkins was the fact investigator for the public defender's office. At the time of Springs's case, Harkins was new to the job; he had taken over for the retiring Bill Bell, and the Springs case was one of his first. The Arkansas Public Defender Commission assigned Mary Paal as the mitigation specialist.

Springs stood trial in Sebastian County Circuit Court in November 2005. Based on the results of a court-ordered mental evaluation, Springs's lawyers did not raise a

3

mental-disease-or-defect defense.  Instead, they argued that Springs was upset about being estranged from his family and "snapped" when he saw Christina at the Fort Smith intersection. They argued that he did not act with the premeditation and deliberation required for a capital-murder conviction.  The trial court instructed the jury on capital murder and the lesser offenses of first-degree and second-degree murder.   The jury found Springs guilty of capital murder and two counts of aggravated assault.

During the penalty phase, the prosecutor introduced Springs's three prior convictions of second-degree battery.  A Sebastian County deputy testified that while Springs was in jail awaiting trial, he threatened the deputy with a comb.  Four of Christina's family members gave victim-impact testimony.  Springs's lawyers called a number of witnesses to testify about his good character.  They continued to press the theory that Springs only attacked and killed Christina because he "snapped." The jury unanimously found three aggravating circumstances: (1) Springs previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death of serious physical injury to another person; (2) in the commission of the capital murder, Springs knowingly created a great risk of death to a person other than the victim; and (3) the capital murder was committed in an especially cruel or depraved manner.

As mitigating circumstances, one or more jurors found (1) the  murder was committed while Springs was under extreme mental or emotional disturbance; (2) Springs was acting under unusual pressures or influences or under the domination of another person; (3) Springs's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the

4

requirements of law was impaired as the result of mental disease or defect, intoxication, or drug abuse; and (4) at least one of Springs's six children expressed a wish to get an answer as to why his father killed his mother, once he became an adult.

The jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and justified a death sentence. The jury sentenced Springs to death for capital murder. It also sentenced Springs to 72 months imprisonment for each count of aggravated assault, as well as a fine of $10,000 for each count.

### 2. Appeal and Post-conviction Review

On direct appeal, Springs was represented by W.H. Taylor, Stevan E. Vowell, and Tonya L. Patrick. The Arkansas Supreme Court affirmed his convictions and sentences. *Springs v. State* (*Springs I*), 368 Ark. 256, 244 S.W.3d 683 (2006). The Sebastian County Circuit Court thereafter denied Springs's petition for post-conviction relief under Rule 37.5 of the Arkansas Rules of Criminal Procedure. Rule 37.5 is Arkansas's special rule for post-conviction proceedings that applies to petitioners who are sentenced to death, and Springs was represented by Jeffrey Rosenzweig. The Arkansas Supreme Court affirmed. *Springs v. State* (*Springs II*), 2012 Ark. 87, 387 S.W.3d 143. Springs filed a petition for a writ of habeas corpus [Doc. No. 1] in federal court.

Now retired Judge Leon Holmes issued an order, listing Springs's interwoven claims of trial error, attorney ineffectiveness, and prosecutorial misconduct. Doc. No. 29 at 7–19. Points 1-1-5, 2-1-9, 3-1-11 (as to Matthew Mooring); issues 3-4 (in part), 3-6, 3-7 (repeated at point 7-6-2), 7-3; and claims 12 and 13 were exhausted in state court and he denied them on

the merits. *Id.* at 20–52.

The remaining claims were procedurally defaulted because they were not fairly presented in state court and there were no available state-court remedies.  Judge Holmes found that there was overwhelming evidence against Springs on the elements of capital murder, and the aggravating factors supporting the death sentence.  Accordingly, Springs could not demonstrate the prejudice required to excuse procedural default on most claims.  Judge Holmes, however, reserved ruling on whether default was excused based on a miscarriage of justice.

There may have been cause to excuse the procedural default of ineffectiveness-of-trial-counsel claims arising from Springs's alleged mental illness, traumatic brain injury, and post-traumatic stress disorder (PTSD).  *Id.* at 62–68.  If those defaulted ineffectiveness-of-trial-counsel claims were substantial, and Springs's post-conviction lawyer was ineffective for failing to raise them, then an equitable exception would open the door for a review on the merits.  *See Trevino v. Thaler*, 569 U.S. 413, 428–29 (2013); *Martinez v. Ryan*, 566 U.S. 1, 14 (2012); *Sasser v. Hobbs*, 743 F.3d 1151, 1151 (8th Cir. 2014).  Doc. No. 29 at 67.

A three-week evidentiary hearing was conducted to determine: (1) whether Springs has a substantial claim of ineffective assistance of trial counsel because Joplin and Haaser did not ( (I) move for a hearing on competency; (ii) object to the mental evaluation as non-compliant with the order regarding a psychological evaluation of Springs; (iii) hire an independent psychological examiner to evaluate Springs and explain his courtroom behavior; (iv) renew the

motion for appointment of an expert to examine Springs's brain injury; (v)  provide mental health experts with relevant information regarding Springs's history; (vi)  investigate and present evidence that Springs's prescribed antidepressant affected his mental state at the time of the crime; and (vii) present to the jury during the sentencing phase evidence of Springs's psychiatric disorders, his brain damage, and the abuse that gave rise to his disorders and damage; (2) whether post-conviction counsel was ineffective for failing to pursue a claim pertaining to his mental illness; and (3) whether trial counsel was ineffective for failing to call Chantelle Mooring as a witness at sentencing, and whether post-conviction counsel was ineffective for failing to call her at the Rule 37 hearing.

## II. LEGAL STANDARD

A substantial claim for ineffectiveness of trial counsel can excuse procedural default if it has "some merit." *Martinez*, 566 U.S. at 14.  "[U]nless post-conviction counsel's failure to raise a claim was prejudicial, the claim remains procedurally barred despite *Trevino*." *Sasser*, 743 F.3d at 1151 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Evaluation of both trial and post-conviction counsels' work therefore requires analysis of the underlying merits of the defaulted ineffectiveness of trial counsel claim.  Springs must show his lawyers' deficient performance and resulting prejudice under *Strickland*.  *Strickland* prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 669.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  This requires a "substantial," not just "conceivable," likelihood of a different result.

7

*Harrington v. Richter*, 562 U.S. 86, 112 (2011).  For alleged penalty-phase error, courts reweigh the aggravating evidence against the totality of the available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  Springs must demonstrate his lawyers' representation "fell below an objective standard of reasonableness." *Id.* at 688.  There is therefore a "strong presumption" that Springs's lawyers "made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, because, "[u]nlike a later reviewing court, [counsel] observed the relevant proceedings, knew of materials outside the record, and interacted with [him], with opposing counsel, and with the judge." *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In addition to demonstrating his lawyers' work was constitutionally deficient, Springs must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669.

## III. NON-HEARING CLAIMS

Although not required, Judge Holmes's rulings on the non-hearing claims are reaffirmed.  *See* Doc. No. 29.  Out of an abundance of caution, additional support for those rulings are offered below.  28 U.S.C. § 2254(b)(2); *see Joubert v. Hopkins*, 75 F.3d 1232, 1244 (8th Cir. 1996).  These are point 1-9-3; issues 1-10, 1-11, 1-12; point 2-1-5; issues 2-10, 3-9, 4-2, 9-8, 9-10; claim 10; and part of issues 5-5 and 9-1.

A.   <u>Resolution of Non-Hearing Procedurally Defaulted Claims</u>

First, Springs argued that his lawyers were deficient because they failed to argue that the Eighth Amendment's bar on the death penalty for intellectually disabled people extends to mentally ill and "mentally disordered" people.  The Eighth Amendment prohibits a death sentence for a person who is intellectually disabled.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  That prohibition does not extend as far as Springs suggests it should, so his appellate lawyers' work was not deficient for failing to raise a meritless claim.  *See Thai v. Mapes*, 412 F.3d 970, 979 (8th Cir. 2005) (counsel not ineffective for failing to make a meritless argument).

Second, Springs, who is black, argues his constitutional rights were violated because black people and poor people were systematically underrepresented in Sebastian County jury pools at the time of his trial.  He claims the percentage of black people in these pools was substantially less than their percentage of the Sebastian County population.  The Sixth Amendment entitles Springs to an "impartial jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 536 (1975).  Springs, however, has failed to show that black people or poor people were not fairly and reasonably represented on juries as a result of systematic exclusion.  *See Berghuis v. Smith*, 559 U.S. 314, 327 (2010).  He has provided only African American census data; he has not provided figures on the racial makeup of juror pools in the judicial district or any statistical analyses showing underrepresentation. *United States v. Horton*, 756 F.3d 569, 578 (8th Cir. 2014).

Springs says Sebastian County's practice of selecting jury panels from voter

registration records ensures black people are underrepresented.  He also contends that their underrepresentation was exacerbated by the prosecutor's racially motivated challenges of potential jurors.  This is unpersuasive because "[a]bsent proof that certain racial or ethnic groups face obstacles in the voter registration process," the use of voter registration lists to select jury pools does not show systematic exclusion.  *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998).  "Evidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion."  *Singleton v. Lockhart*, 871 F.2d 1395, 1399 (8th Cir. 1989).  Springs's fair cross-section claim is denied on the merits.  His related ineffectiveness claims are also denied.  His lawyers' work was not constitutionally deficient for not raising a meritless claim.  *Thai*, 412 F.3d at 979.

Third, Springs contends his trial lawyers were constitutionally ineffective during the post-trial period.  He states his lawyers should have interviewed jurors and moved for a new trial based on juror misconduct, and made ineffective-assistance-of-counsel claims.  Springs, however, has not developed any argument that his lawyers' work was deficient for failing to raise these claims in a new-trial motion.  Moreover, Arkansas's post-trial deadlines "make it virtually impossible for ineffectiveness claims to be developed adequately or pursued successfully in a new trial motion."  *Anderson v. Kelley*, No. 5:12-cv-279-DPM, 2017 WL 1160583 at *12 (E.D. Ark. Mar. 28, 2017).  Springs's argument that his lawyers should have discovered juror misconduct fails for the same reasons set out in the denial of relief on the related ineffectiveness of trial counsel claims.  This ineffectiveness claim about his lawyers' post-trial work is not substantial, so the default is not excused under *Martinez-Trevino*.

Springs's related claim about his appellate lawyers also fails because their performance was not constitutionally ineffective for failing to seek a remand to file a new-trial motion. *Thai*, 412 F.3d at 979.

Fourth, Springs is not entitled to habeas relief based on stand-alone claims of his post-conviction lawyer's constitutional ineffectiveness, as "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Fifth, Springs says his trial and appellate lawyers' work was constitutionally deficient based on their "overall performance,"  but he is not entitled to a cumulative assessment of alleged constitutional errors. Doc. No. 29 at 51. His similar claims for cumulative review of his lawyers' performance fail because cumulative error is not grounds for habeas relief. *See Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006).

B.     Resolution of Remaining Non-Hearing Procedurally Defaulted Claims

Most of Springs's remaining procedurally defaulted claims were not part of the evidentiary hearing or related to hearing issues. These are issues 1-3 (in part), 2-3, 2-4, 2-5 (in part), 2-6, 2-7, 2-9, 3-2, 3-3, 3-4 (in part), 3-5, 3-8; claims 6 and 11; most of issues 2-1 and 2-8, and claims 4, 7 and 9; and part of issues 3-1 and claim 5. These claims fall into two groups: (1) ineffective-assistance-of trial-counsel claims implicating *Martinez-Trevino*; and (2) fair jury, prosecutorial misconduct, trial error, and ineffective-assistance-of-appellate-counsel claims.

*1. Ineffective-Assistance-of-Trial-Counsel Claims*

In these non-hearing defaulted ineffectiveness claims, Springs argues his trial lawyers should have worked harder to ensure a fair jury and to exclude prejudicial evidence. He relies in part on jury questionnaires that are not part of the habeas record. He also says his lawyers should have challenged juror and prosecutorial misconduct, presented more mitigation evidence, and done a better job with jury instructions. Springs has not demonstrated that he was actually prejudiced in the *Strickland* sense by any of these alleged errors.

Springs says his trial lawyers should have presented detailed affidavits, more media reports, and better analysis of juror questionnaires to support the change-of-venue motion, and renewed the motion after voir dire. The trial court encouraged Springs's lawyers to refile the venue motion after voir dire, if they could demonstrate that the jury panel was so influenced by pretrial publicity that Springs could not receive a fair trial. During voir dire, the trial court asked each potential juror individually about her exposure to pretrial publicity, the timing of that exposure, and its effect on her opinions. It is true many had read about the case, particularly when the crime occurred ten months earlier. The trial court, however, questioned these jurors about whether they were influenced by that exposure. The court dismissed for cause three potential jurors, and one potential alternate juror, who could not set aside what they had heard or read. Springs has not demonstrated that the trial court would have granted the venue motion with more evidence or a renewed motion. He has not shown that biased jurors were seated, or that a jury from another venue would have decided his case differently. Springs has not shown he was actually prejudiced by his lawyers' work. *Matthews v. Purkett*, 383 Fed. App'x 583, 585 (8th Cir. 2010). His defaulted ineffectiveness claim is therefore not

substantial, and the *Martinez-Trevino* equitable exception does not excuse the default.

Springs argues his trial lawyers should have asked two seated jurors, Karen Speaks and Joe Marchant, and several excused potential jurors more follow-up questions about pretrial publicity. Pretrial publicity was addressed during voir dire. Jurors Speaks and Marchant told the court that they had read newspaper articles about the case, but not recently. Both said they could set aside any opinions and decide the case based on the evidence. Springs also claims that his lawyers should have asked about potential jurors' understanding of mitigating evidence and about their views of, and experiences with, domestic violence. Springs's lawyers' questioning of jurors was adequate. Springs, moreover, has not shown that the jury was tainted, or that a biased juror was seated. *Sanders v. Norris*, 529 F.3d 787, 790–94 (8th Cir. 2008). The defaulted ineffectiveness claims are not substantial. Procedural default is not excused.

In related claims, Springs says his trial lawyers should have used peremptory strikes or moved to exclude for cause jurors Speaks and Marchant based on their exposure to pretrial publicity which caused them to form opinions about the case. Both, however, stated during voir dire that they could set any opinions aside. Springs also points to Marchant's death penalty views. Marchant, however, explained that he believed that a death sentence should be applied on a "case by case basis." Trial R. at 1042. He said that, if he was in Springs's "seat," he "would want somebody on the jury to give [him] a fair trial." *Id.* at 380–81. Springs also says his lawyers should have challenged juror William Sowell for cause because he knew the prosecutor from a time when both coached boys' baseball teams. Sowell had not seen the prosecutor in fifteen years other than passing him on the street. He said that he could decide

the case based on the evidence and would not feel the need to offer anyone an explanation for his decision. Springs has not demonstrated that his lawyers failed him by not challenging these jurors. *Williams v. Norris*, 612 F.3d 941, 954–55 (8th Cir. 2010). He has not shown the jurors were impermissibly biased against him, or that their service on the jury deprived him of a fair trial. *Id.* The defaulted ineffective claims are not substantial. *Martinez-Trevino* does not open the door for merits review.

Springs says his trial lawyers' performance was constitutionally deficient for not challenging the excusal—for cause and hardship—of qualified jurors. He argues his lawyers should have objected to the trial court's removal of some jurors based only on questionnaire responses. He contends they should have asserted a *Batson* challenge when trial court excused for cause Donald Bray, a black man, based on his and his wife's acquaintance with the Springs family. *See Batson v. Kentucky*, 476 U.S. 79 (1986). Springs, however, has not shown a reasonable probability of a different outcome had these potential jurors been seated. The allegation that a qualified potential juror was excluded is insufficient to demonstrate *Strickland* prejudice. *Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998). *Batson*, moreover, applies only to peremptory strikes. *United States v. Elliott*, 89 F.3d 1360, 1364–65 (8th Cir. 1996). Springs next argues that his lawyers should have pressed harder for individual, sequestered, voir dire. Springs also says that, after he was observed mouthing "I'm sorry, I'm sorry" to two jurors immediately after their selection, his lawyers should have sought to excuse the jurors, or alternatively consented to more detailed questioning about what they had seen. Both jurors told the trial court that they did not see anything that "gave [them]

any concern." Trial R. at 914. Springs does not show he was actually prejudiced by his lawyers' work during voir dire. He does not demonstrate the substantial likelihood of a different result if his lawyers had made different decisions. These defaulted ineffectiveness claims are not substantial, and the *Martinez-Trevino* equitable exception does not excuse the default.

Springs says his trial lawyers should have objected during the guilt phase to admission of a recording of a 911 call. He also says that they should have challenged the prosecutor's inflammatory arguments in both the guilt and penalty phases. In light of the overwhelming trial evidence, however, there is not a reasonable probability of a different outcome, even if the 911 recording had been excluded or his trial lawyers had objected to the prosecutor's inflammatory arguments.

Springs contends his lawyers' work was constitutionally deficient for not requesting a theory-of-the-defense instruction that the prosecutor must disprove beyond a reasonable doubt that the homicide was committed in an impulsive manner. The trial court, however, properly instructed the jury on the mental states required for capital murder and the lesser offenses of first- and second-degree murder. Springs says his lawyers should have relied on available medical records to support a manslaughter instruction. The instructions were sufficient and trial evidence of capital murder was compelling. Springs was not actually prejudiced by the absence of a theory-of-the-defense or manslaughter instruction. Springs has not shown a substantial ineffectiveness claim, and procedural default is not excused.

Springs says his lawyers should have worked harder to introduce two pieces of

15

mitigation evidence which, he says, would have shown that he was in a state of emotional distress at the time of the murder because he believed Christina abused and neglected their children.  He says they should have interviewed and called his young son, Michael, to testify about his reporting to Springs that he feared being abused by Christina.  Springs has not demonstrated *Strickland* prejudice.  There is not a reasonable probability that, with this additional mitigation evidence, Springs's sentence would have been different.  Springs has not shown a substantial ineffectiveness claim, and procedural default is not excused by the *Martinez-Trevino* equitable exception.

Springs says his trial lawyers' work was constitutionally deficient because they failed to object to victim-impact testimony.  Four victim-impact witnesses testified, reading from written statements introduced into evidence.  In *Springs I*, the Arkansas Supreme Court held the testimony was admissible.  244 S.W.3d at 693–94. The court recognized "this is not a situation where the testimony of the victim's father, two sisters, and one of her children was unduly prejudicial but rather was relevant to show the impact her death had on her family." *Id.* Springs's lawyers were not constitutionally ineffective for not raising a meritless claim. *Thai*, 412 F.3d at 979.  Springs, moreover, has not demonstrated *Strickland* prejudice because he has not shown a reasonable probability that his death sentence would have been different absent that evidence.  The defaulted ineffectiveness claim is not substantial, and the *Martinez-Trevino* equitable exception does not allow for merits review.

Springs also challenges his lawyers' work related to the mitigating-circumstances verdict form.  The related underlying claim (issue 7-3) was rejected on the merits.  Doc. No.

29 at 48–50.  Springs argues that his lawyers should have pressed harder in seeking advance notice of aggravating circumstances and in challenging the submission of two aggravating circumstances based on insufficient evidence.  This was decided on state procedural grounds and is not reviewable in this habeas proceeding.  *Id.* at 50–51.  Springs's criminal history and the circumstances of the crime were known to his lawyers.  Possible aggravators were limited to the statutory list, Ark. Code Ann. § 5-4-604.  There is, therefore, no actual prejudice based on a lack of notice.

In closing, the prosecutor conceded as inapplicable the now-challenged aggravators: the capital murder was committed for the purpose of avoiding arrest or escaping from custody, and the capital murder was for pecuniary gain.  Compelling evidence, moreover, supported the aggravators found by the jury.  Springs contends his lawyers should have challenged the trial court's instruction about the possibility of parole with the aggravated-assault sentences. He says the jury was misled to believe there was a possibility of his release, if he was not sentenced to death for capital murder.  The trial record does not support this argument.  The possibility of release was part of the trial court's instruction on the aggravated-assault sentence.  The capital-murder instruction and verdict form recited the two possible sentences for that crime: life imprisonment without parole, or death.  Springs's defaulted ineffectiveness claims are not substantial, and procedural default is not excused.

Springs next asserts that if his trial lawyers had discovered and raised the issue of juror misconduct, the trial court would have granted a new trial.  The trial record reflects Juror Number 12 reported during the trial that Juror Number 11 was mumbling and, later, pointing

17

at her notes and making comments.  During closing arguments in the penalty-phase, Juror Number 11 began crying and told Juror Number 12 that looking at Springs's children made her cry.  Springs's trial lawyers requested a mistrial based on the communication between jurors. The trial court questioned Juror Number 12, who said the communication had not influenced her thinking about the case, and the court thereafter denied Springs's motion.  Springs does not suggest what more his lawyers could have done.

Springs also makes three bare allegations about jury deliberations: (1) several jurors discussed the case outside the presence of the entire jury during a break from penalty-phase deliberations and made a pact to prolong deliberations until the jury unanimously agreed to a death sentence; (2) those jurors and others coerced a juror, who was in favor of sentencing Springs to life imprisonment, into voting for a death sentence; and (3) one juror made comments about the interracial marriage of Springs and Christina.   Springs says his lawyers should have discovered and objected to the alleged misconduct.  He has not proffered affidavits, or any other materials, to support his allegations.

After the jury returned its verdict, jurors were individually polled, with each stating the sentence of death was his or her decision. Moreover, affidavits and statements of jurors' thought processes—including alleged intimidation by other jurors— may not ordinarily be used to impeach a verdict once the jury has been discharged. Fed. R. Evid. 606(b); Ark. R. Evid. 606(b); *United States v. McGehee*, 532 F.3d 733, 741 (8th Cir. 2008).  Also, the allegations here are unlike the racial-bias comments that lifted the Rule 606(b) bar in *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017).  The juror's alleged reference to interracial marriage does

18

not "tend to show that racial animus was a significant motivating factor in the juror's vote" for a death sentence. *Id.* at 869. Springs has not demonstrated a substantial likelihood that he would have been granted a mistrial based on juror misconduct, if his trial lawyers had sought one. He has not shown the *Strickland* prejudice required for a substantial ineffectiveness claim, and procedural default is not excused.

Finally, Springs alleges his trial lawyers' work was constitutionally deficient for not raising a cumulative-error argument based on "multiple errors and deficiencies" in the guilt and penalty phases. The Arkansas Supreme Court "does not recognize the cumulative-error doctrine when there is no error to accumulate." *Green v. State*, 2013 Ark. 497, *34, 430 S.W.3d 729, 751 (citing *Gaines v. State*, 340 Ark. 99, 115 (2000) (quotations omitted)). Springs has not demonstrated the constitutional errors necessary to make up a cumulative-error argument. He has not shown a substantial ineffectiveness claim, and *Martinez-Trevino* does not open the door for merits review.

### 2. Prosecutorial Misconduct, Trial Error, and Appellate Ineffectiveness Claims

The *Martinez-Trevino* equitable exception does not extend to Springs's defaulted claims of trial error, prosecutorial misconduct, or ineffective assistance of appellate counsel. See *Davila v. Davis*, 137 S. Ct. 2058, 2063–70 (2017); *Martinez*, 566 U.S. at 14. The essence of Springs's argument mirrors his intertwined ineffective-assistance-of-trial-counsel claims. He says that he was prejudiced by jury selection and the introduction of inflammatory photographs, and he challenges penalty-phase jury instructions. He argues that the prosecutor made improper, inflammatory arguments, and the trial court failed to give a manslaughter

instruction.   Springs says more mitigation evidence would have made a difference at sentencing.   He repeats allegations of his lawyers' missteps at trial as ineffective-assistance-of-appellate-counsel claims.   It was determined that Springs cannot demonstrate the required procedural-bar prejudice to overcome the default of these claims. That standard requires Springs to show "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis original) (quotations omitted)).   The record contains overwhelming evidence against Springs on the elements of capital murder and on the aggravating factors supporting the death sentence. There would not have been a difference in the outcome at either the guilt or penalty phase if the evidence had been introduced, or excluded, as Springs argues in these claims.   Springs has not demonstrated that a seated juror was biased.   Jury instructions were adequate, and these claims fail as procedurally defaulted.

## IV. HEARING CLAIMS

A three-week hearing was held on Springs's defaulted ineffectiveness-of-trial-counsel claims related to his alleged mental illness, traumatic brain injury, and PTSD.   The hearing claims are most of issue 1-1, and point 1-9-1, issue 2-2, issue 2-5 (in part), and issue 3-1 (in part).   The decision on these claims will inform related trial error and prosecutorial misconduct claims.   Broadly, the hearing addressed two questions: (1) Did Springs's trial lawyers meet "the constitutional minimum of competence" in investigating and presenting his

alleged mental illness, traumatic brain injury, and PTSD? *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); and (2) Can Springs demonstrate a substantial likelihood that, absent the alleged error, the results of the guilt or sentencing phase would have been different? *Harrington*, 562 U.S. at 112. If the first answer is yes, then Springs cannot show that his lawyers' performance at trial was deficient. If the first answer is no, Springs can probably show deficient performance. The second question must be answered in the affirmative if Springs is to show *Strickland* prejudice.

To prevail, Springs would have to demonstrate: (1) his incompetence to stand trial; (2) his lack of mental capacity to act with premeditated and deliberated purpose; (3) his lack of mental capacity, as a result of mental disease or defect, to conform his conduct to the requirements of law or to appreciate the criminality of his conduct; or (4) a reasonable probability the jury would have determined life imprisonment was the appropriate sentence if presented with more or different evidence.

These claims arise out of eight alleged actions by Springs's trial lawyers: (1) failure to move for a hearing on competency; (2) failure to object to the court-ordered mental evaluation as non-compliant with the trial court's order; (3) failure to hire an independent psychological examiner to evaluate Springs and  explain his courtroom behavior; (4) failure to renew the motion for appointment of a brain-injury expert; (5) failure to provide mental-health experts with relevant information regarding Springs's social and medical history; (6) failure to investigate and present evidence that Springs's prescribed antidepressant affected his mental state at the time of the crime; (7) solicitation and acceptance of Springs's waiver of evidence

about Christina's character; and (8) failure to investigate and present evidence about Springs's mental illness, brain damage, and childhood trauma at the guilt and sentencing phases. The seventh argument, about evidence of Christina's character, was rejected on state procedural grounds and is not reviewable here. Doc. No. 29 at 21–23; *Springs II*, 387 S.W.3d at 159.

Also under consideration is whether Springs's trial lawyers were constitutionally ineffective for not calling his daughter, Chantelle, as a mitigation witness. During the habeas discovery period, Springs refused to submit to a mental examination by Kelley's experts. Limited sanctions were imposed, and an inference was drawn against Springs's alleged mental illness. *See* Doc. No. 126. The inference is that, had Springs submitted to the mental evaluation, Kelley's experts would have found that he was not mentally ill at the time of the murder. Springs was present when the evidentiary hearing began, but when a family member testified about Springs's family history, Springs got upset and asked to return to the holding cell. Springs later stated on the record that he did not want to be present for the remainder of the hearing, and he was transported back to the Arkansas Department of Corrections ("ADC").

A.   Findings of Fact and Conclusions of Law

When Joplin was appointed lead counsel in January 2005, he was already familiar with the Springs family. He represented Springs in a felony battery case against a police officer. That conviction was introduced in aggravation as one of the three prior violent felonies. Joplin also represented Springs's mother, Lorine, in two separate misdemeanor battery cases involving co-workers, as well as Springs's sister, Laverna. In one case, Lorine was found in contempt and sent to jail for shouting at the trial judge and banging on his bench. She

subsequently protested jail conditions by mailing a cockroach to the judge. While representing Lorine, Joplin learned of her prior felony conviction in Arizona.

Based on regular visits with Springs, Joplin described him as upset and depressed, rather than psychotic. Haaser believed Springs was "somewhat" paranoid, but said he did not have trouble communicating with the lawyers. Doc. No. 184 at 25. He said there was no reason to believe Springs could not assist in his own defense. Haaser testified that Springs had "somewhat of a bad temper" and had controlled, or attempted to control, Christina. *Id.* at 84–85. Haaser did not remember Springs saying that he could read minds or heal people. He did not remember Springs saying that God spoke to him or that he heard voices.

Joplin filed an *ex parte* motion for appointment of a mitigation specialist in April 2005. He abandoned that motion and completed the necessary paperwork for funding by the Arkansas Public Defender Commission in June 2005—halfway through his representation of Springs. The Commission sent Paal, who spent a total of thirteen hours on the case. Joplin's understanding was that Paal would fulfill the role of a mitigation specialist, but Paal testified that her role was limited to determining if Springs's children should attend his trial. Joplin knew that Paal only met with Springs once, and she talked to him about his relationship with Christina.

Based on conversations with Springs, Joplin identified the defense strategy early on: Springs was a "good dad" and Christina abused the children. Doc. No. 185 at 39–40. Springs was cooperative and gave his lawyers names of potential witnesses. Springs's lawyers focused on investigating Springs's adult life, talking to neighbors and co-workers. Joplin interviewed

23

Springs's sister, Jannifer, by telephone.  Fact investigator Harkins helped with the investigation by locating potential witnesses, following up on leads, and collecting records.  Joplin testified that he looked for witnesses to support the defense theory.  The defense team asked about Springs's character and his relationship with Christina and their children.  They obtained a court order for access to DHS and medical records on the Springs children.  DHS records showed that three allegations of child maltreatment of Chantelle—reported in 1990, 1991, and 2004 against Christina—were found true; Springs's lawyers located witnesses who would have testified about the reports.  They talked to a neighbor who heard Christina, in 2004, call the children racial slurs. The neighbor also saw Christina hit one child and grab another.  Another witness heard Christina call Chantelle a racial slur in 1991.  Joplin reached out to the Springs children through the attorney ad litem, though he did not interview them.

Joplin's file reflects the information the defense team learned about Springs's background: Springs was born in Phoenix and attended the "James Watson School" there  for "retarded children."  Doc. 185 at 79.  He fell off the back of a truck and suffered a head injury at a young age.  He stuttered and was teased as a child.  His mother, Lorine, grew up in Crossett, Arkansas, and the Springs family moved from Arizona to Crossett and then to Fort Smith, Arkansas.  Springs twice sought treatment for depression shortly before the murder at the ProMed Cooper Clinic, where he was diagnosed with depression and anxiety, prescribed two different antidepressants, and referred for psychiatric treatment.  Springs told Joplin the medication "made him less anxious but didn't really help with his depressed mood."  Pet'r's Ex. 18 at 3.  The trial lawyers knew the names of Springs's family members, and the public

schools that Springs attended.

In April 2005, Springs's trial lawyers sought a mental evaluation. Trial R. at 178–79. They asked for an "in-depth examination of all possible psychological factors which could have a bearing" on Springs's case. They argued that Springs "should be housed, observed, and tested over a period of time and not merely seen and interviewed for a few hours." *Id.* The trial court granted Springs's motion and ordered a "full forensic examination and observation" at the Arkansas State Hospital, with the exam not to exceed thirty days or such longer period as deemed necessary. *Id.* at 233–34. The trial court ordered the examiner to include an opinion on whether Springs, "as a consequence of the mental disease or defect, lacks the capacity to understand the proceedings against him and to assist effectively in his own defense." *Id.* The prosecutor's office then sent a letter to DHS to schedule the evaluation. That letter stated the court ordered a "one day psychiatric evaluation" and requested an appointment time. *Id.* at 236. The then-prosecutor, the Honorable Steven Tabor, testified that the letter was prepared by an office employee and that he did not instruct her to seek only a one-day evaluation. He did not realize the error until it was pointed out at the evidentiary hearing. Springs's lawyers received notice that the appointment was scheduled at the office of Paul Deyoub, a psychologist, for May 19, 2005.

Also in April 2005, Springs's lawyers filed an *ex parte* motion for an expert to evaluate Springs for a possible brain injury and its effects. They reported Springs suffered a childhood head injury and received treatment at Good Samaritan Hospital in Phoenix, but there were no medical records available. Springs's lawyers believed the injury may have affected the part of

25

Springs's brain that governs emotions.  They argued that evaluation results might establish the defense of mental disease or defect, negate the existence of the required mental states for capital or first-degree murder, or support mitigating circumstances.  The trial court denied that motion as premature because Deyoub had not yet completed his evaluation.  The trial court noted Springs's right to refile the motion after his lawyers reviewed that report.

Deyoub interviewed Springs for two hours on June 21, 2005 and administered four tests: Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), Wide Range Achievement Test-Third Revision (WRAT-3), Minnesota Multiphasic Personality Inventory-2 (MMPI-2), and the Competency to Stand Trial Assessment Instrument.  He reviewed the police file on the crime.  Deyoub's report states the referral issues: opinions relevant to Springs's diagnosis, fitness to proceed, culpable mental state, and criminal responsibility.  He testified that his inquiry was narrow and that he was not asked to consider mitigating evidence.  Haaser agreed with the characterization that Deyoub did a "drive-by evaluation."  Doc. No. 184 at 56.

Deyoub submitted his report in July 2005.  He referred to Springs's 1998 treatment for depression at Charter Behavioral Health Hospital.  Deyoub found that Springs had the capacity to understand the proceedings against him and the capacity to assist effectively in his own defense.  He found Springs had the capacity to conform his conduct to the requirements of law and appreciate the criminality of his conduct.  He said Springs had the capacity for the culpable mental state necessary for capital murder.  Deyoub determined Springs did not have a mental disease or defect and diagnosed him with an adjustment disorder with depressed mood.  He described Springs's responses in the competency assessment as "more than adequate."  Trial

R. at 327. He determined that Springs was functioning within the average range of intelligence, based on an IQ score of 96. Deyoub found that Springs read at a seventh-grade level and that his arithmetic was unimpaired. He found "no evidence" that Springs "has ever been psychotic or that he has ever had hallucinations or delusions." *Id.* at 327. He noted "anger, rage, and domestic violence do not constitute inability to conform one's conduct to the requirements of the law." *Id.* at 328. Springs's trial lawyers did not believe Deyoub's diagnosis—adjustment disorder with depressed mood—helped the defense.

In August 2005, Springs's lawyers received authorization from the Commission for funds to hire Bradley Diner, a psychiatrist. Gregg Parrish, Executive Director of the Arkansas Public Defender Commission, testified that the Commission pays for defense experts and that in capital cases in 2005, the request was usually granted. According to Diner's notes, Springs reported that he fell out of his father's truck and injured his head. He said that he stuttered and took Ritalin as a child and had to attend a special school because of the stuttering; that he had been hospitalized for depression at Charter Behavioral Health Hospital, and that he recently had been prescribed Effexor, which helped somewhat. Springs said his mother occasionally took a "nerve pill," and that his half-brother had schizophrenia. Springs told Diner that he and Christina fought frequently, and that he would "get provoked" and hit her. Diner described Springs as tangential, repetitive, and grandiose. *See* Pet'r's Ex. 17. Diner told Joplin that Springs's mental issues did not rise to a defense under the law. According to Joplin's notes, Diner also told him that Springs "rationalized" the murder and was "not at all remorseful about her." Doc. No. 186 at 56. Diner said Springs "talks of hitting and beating wife" (sic) and

27

"justifies it." *Id.* Diner told Joplin the murder was "clearly premeditated," and that Springs was angry about Christina's alleged mistreatment of their children. *Id.* at 58. Joplin asked Diner not to prepare a report because he did not want to turn it over to the prosecutor.

At trial, Springs's lawyers presented the guilt-phase defense theme developed from the early interview with Springs: Springs was devoted to his family and inconsolable when Christina left with their children. Spring's lawyers tried to show the murder was an impulsive, out-of-character action. They stated that due to the separation from his family, Springs was in a "state of despair" and "snapped from emotional stress and pain." Trial R. at 1215–16. They elicited testimony on cross-examination that Springs was distressed when, leading up to the murder, he threatened Christina. They presented evidence that Springs did not intend to meet Christina at the Fort Smith intersection. They carried the theme into the penalty phase. They planned to present evidence that Springs was a good parent and active community member, whereas Christina mistreated the children. They intended to argue that, at the time of the murder, Springs was emotionally distressed because he was separated from his children and worried about their safety. They anticipated calling witnesses that they had interviewed to talk about Christina's treatment of the children.

After the penalty phase began, Springs told his lawyers and the court that he did not want to introduce negative evidence about Christina. The trial court called Springs to the bench, explained his right to introduce mitigating circumstances, and described how the court would determine the admissibility of the evidence. The trial court asked about Springs's education and other matters pertaining to his ability to understand. Springs then waived his right to

28

present the mitigating evidence because he did not want witnesses to criticize his deceased wife.  The trial court found he did so freely and voluntarily.  The next morning, Joplin advised the trial court that Springs's waiver "was the right decision," and he "was very satisfied with it."  Trial R. at 1741.  Joplin struggled with whether to present negative evidence about Christina and was "relieved" when Springs did not want to present it.  Doc. No. 185 at 133.

Mitigation witnesses testified that Springs was a helpful neighbor, hard-working employee, loving father, and community volunteer.  Springs's lawyers called witnesses to testify that Springs was upset about Christina leaving with the children.  They introduced records from the ProMed Cooper Clinic showing that, after Christina left, Springs twice sought treatment for depression.  That argument had some pull for the jury.

At least some jurors found that evidence supported three related mitigating circumstances: (1) the capital murder was committed while Springs was under extreme mental or emotional disturbance; (2) Springs was acting under unusual pressures or influences or under the domination of another person; and (3) Springs's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as the result of mental disease or defect, intoxication, or drug abuse.

Springs now argues that his trial lawyers missed evidence that would have made a difference: that he has brain damage from his head injury, had a traumatic childhood, and suffered from mental illness.  Springs describes his trial lawyers' investigation as superficial and inadequate. He argues that they lacked the requisite skills and experience, and that their caseloads were too heavy to allow sufficient time to build rapport with witnesses, conduct a

comprehensive social-history investigation, or adequately explore a mental-health defense. Springs introduced evidence at the evidentiary hearing that, although Paal was an advanced-practice psychiatric nurse, his trial lawyers failed to take advantage of her training or integrate her into the defense team's work.  He argues that his lawyers decided on a trial strategy too early, before they had done the thorough investigation necessary to inform that strategy.

Springs's trial lawyers had a duty to investigate "or to make a reasonable decision that [rendered] particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  In deciding ineffectiveness claims, a "heavy measure of deference" is applied to counsel's judgments. *Id.*  Trial lawyers' work is constitutionally ineffective if they "ignore pertinent avenues of investigation of which [they] should have been aware." *Porter v. McCollum*, 558 U.S. 30, 40 (2009).  Lawyers may, however,  "draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 382–83 (2005).

Springs's trial lawyers admitted Springs's childhood was not a focus of their investigation. They knew Springs came from a dysfunctional family, and they suspected he was abused.  Springs "hinted" that Lorine had pointed a gun in his face.  Doc. No. 185 at 80. Springs's lawyers, however, did not uncover the details of his childhood home environment. Haaser talked to family members but could not  build rapport with them.  He said family members were unhelpful and would only say that Springs came from a "normal" family.  Doc. No. 184 at 38.  Both Springs and his sister, Jannifer, denied being abused as children.  Springs told his lawyers that he did not want to tell on his mother.  Doc. No. 185 at 37.

Joplin was in contact with Springs's mother, Lorine, but did not conduct an in-depth

interview.  He did not recall interviewing Springs's siblings, other than Jannifer.  The lawyers did not interview Springs's children, childhood friends, teachers, or extended family.  Springs's lawyers knew that Springs had lived in Arizona, but they did not send an investigator.  They did not learn that the "James Watson School" that Springs reportedly attended was actually the Jane Wayland School, and they did not discover that the school served children with "emotional disorders."  Pet'r's Ex. 45 at 18.  They obtained authorizations for Springs's public school records but did not actually get them.  Those records would have shown Springs's poor performance and social promotion and his three-year absence while he was presumably attending the Jane Wayland School.  Springs's lawyers did not investigate his family history of mental illness.  They did not discover that Lorine and Springs's half-brother, Willie Flanagan, had both been diagnosed with schizophrenia, or that Springs's aunt, Ruby Jewel Warren, was committed to the Arkansas State Hospital in 1971, after stabbing to death her newborn baby.  Springs's lawyers did not uncover family criminal records, most notably of Lorine and Willie, demonstrating the instability of the Springs home and Lorine's bad influence.

Springs also says his lawyers should have been alerted to potential mental illness symptoms.  In Joplin's notes of an early meeting with Springs, he wrote "looks like emotional disturbance."  Doc. No. 185 at 36.  Joplin also recorded that  shortly before the murder, Springs interpreted a dream as directing him to travel to Kentucky for spiritual guidance.  Springs told Joplin that he left Kentucky after having a feeling that his children were going to die.  Joplin did not remember any evidence supporting Springs's belief that his children were

in mortal danger in Christina's care.

Springs says his lawyers should have challenged Deyoub's evaluation, based on its brevity and non-compliance with the trial court's order. He argues that with an in-patient evaluation, his psychosis would have been apparent. He says his lawyers failed to provide Deyoub with his social and medical history necessary for an informed diagnosis. He notes that Deyoub's referral questions were limited to competency and mental state. He argues that they should have timely hired an independent psychological examiner to do a more extensive evaluation and explore potentially-mitigating mental illness. Experts at the evidentiary hearing testified the nineteen-point difference between Springs's verbal and performance scores on the IQ test was an indicator of brain damage. Springs says his low reading and spelling scores should have spurred his lawyers to pursue school records.

Springs says his lawyers' work was constitutionally deficient for failing to explore Deyoub's reference in the report to his 1998 treatment for depression at Charter Behavioral Health Hospital. *See* Pet'r's Ex. 4. Springs sought in-patient treatment there for suicidal ideation after Christina, at the time his girlfriend, left him and took the children. *Id*. at 7. He stayed at the facility for three days. In those records, Springs reported significant childhood abuse by his mother. Springs was diagnosed with depression with recent suicidal thoughts and a personality disorder not otherwise specified. He also was given a rule-out diagnosis for PTSD, meaning the diagnosis should be considered but information is incomplete. Springs contends that, even if his trial lawyers decided not to introduce those records because they include evidence of his abuse of Christina, the records would have been a springboard for other

investigation based on references to his childhood abuse, mental illness, and PTSD symptoms.

Springs argues his lawyers should have refiled the motion for a brain-damage expert or requested the necessary funds from the Public Defender Commission. Deyoub's report did not address whether a brain injury affected the emotional part of Springs's brain. Taylor testified at the evidentiary hearing that, in reviewing the trial record to prepare the appeal, he did not understand why trial lawyers did not order an MRI and retain a neuropsychologist and psychiatrist, based on Springs's head injury. He argued on direct appeal that the trial court had a duty to intervene and appoint a head injury expert *sua sponte*. The Arkansas Supreme Court denied relief on state procedural grounds and based on *Ake v. Oklahoma*, 470 U.S. 68 (1985). *Springs I*, 368 Ark. at 260–63.

Springs says his trial lawyers should have moved for funding for an expert on the effects of Springs's antidepressant medication prescribed at ProMed Cooper Clinic. Neither lawyer could remember why the motion was not filed. Springs argues that, as with Deyoub, Diner did not spend sufficient time with him or have the necessary social and medical history to make an informed diagnosis. Springs notes that the prosecutor took advantage of the absence of mental-illness evidence in the penalty phase. He points to the prosecutor's closing argument: "[Y]ou have heard absolutely no testimony from a psychiatrist or a psychologist that the Defendant suffered from any mental disease or defect and that defense was never raised by the Defendant. That factor does not exist, there simply is no evidence that it exists." Trial R. at 1786.

Springs also argues his post-conviction lawyer, Rosenzweig, made similar mistakes.

Rosenzweig, who was recommended by the Public Defender Commission, was appointed in June 2007.  Rosenzweig is an experienced and capable lawyer.  He now states that he did not devote sufficient attention to Springs's case.  At the time of the appointment, Rosenzweig was carrying a heavy caseload and was " being pulled in a hundred different directions."  Doc. No. 187 at 32.  Lisa Croy, now Bartlett, was the mitigation specialist.  She and Rosenzweig were not on the same page: Rosenzweig testified that he delegated the investigative work to Bartlett.  She says that she only completed tasks as assigned by Rosenzweig.  In any event, Bartlett did not finish the job and there was little investigation.

In the Rule 37 petition, Rosenzweig alleged Springs's lawyers were constitutionally ineffective for failing to renew their motion for an evaluation of Springs for brain damage.  Rosenzweig hired Bob Gale, a psychiatrist, in August 2007.  He asked Gale to do a "fairly brief" interview with Springs and sent Gale a summary of Deyoub's report.  The interview lasted about two hours, and Gale took two pages of handwritten notes. Pet'r's Ex. 69 at 146–47.  Gale described Springs as hypomanic and paranoid with pressured speech and scattered thought.  He noted Springs's inappropriate laughter and sobbing to the point of losing emotional control.  Gale learned about Springs's childhood head injury, attendance at a special school, admission to Charter Behavioral Health Hospital, and family history of mental illness.  Gale had the "strong provisional opinion" of a "schizoaffective and/or bipolar type 1 psychiatric disorder and concurrently neurological deficit" based on the childhood brain injury. *Id.* at 51.  Gale said that he reviewed his notes with Rosenzweig and recommended a full battery of neuropsychological testing.  He challenged Deyoub's assessment that Springs had

34

an adjustment disorder because that diagnosis is based on a short-term reaction to a specific event.  He said the nineteen-point different in verbal and performance IQ scores on the IQ test administered by Deyoub was a "very bright red flag that something is not firing right in [Springs's] brain."  *Id.* at 58.  Gale said he highlighted those issues to Rosenzweig and asked Rosenzweig for more records.  Rosenzweig only remembers Gale reporting that there were issues that needed to be further examined but defers to Gale on that point.

Rosenzweig next hired a psychologist, James Moneypenney, to conduct neuropsychological testing.  Moneypenney reported a full-scale IQ score of 94.  He noted in his written report that Springs's test results on the Nalstead-Reitan Neuropsychological Test Battery are "associated with mild to minimal cognitive impairment."  Pet'r's Ex. 26 at 2.  In a subsequent letter to Rosenzweig, Moneypenney described the results as showing "no evidence of significant cognitive impairment or dysfunction."  Pet'r's Ex. 25 at 3.  In any event, Rosenzweig did not inform Gale of the neuropsychological testing, and Gale and Moneypenney never conferred.  Upon later review of Moneypenney's report, Gale pointed out that Springs's results have a troubling twenty-point difference between the verbal and performance test results.  He questioned Moneypenney's interpretation of Springs's results on the Nalstead-Reitan Neuropsychological Test Battery.  Gale disagreed with the opinion that there was no indication of significant cognitive impairment.  Pet'r's Ex. 69 at 77.  He said that, if Rosenzweig or Moneypenney had consulted with him, he would have recommended "next-level" neuropsychological testing to "pinpoint potential areas of dysfunction."  *Id.* at 76.  After the evaluations, Rosenzweig amended his Rule 37 petition, but did not include any expert

opinions about Springs's brain damage or mental illness.  He abandoned the related claim at the Rule 37 hearing.

 Springs contends there was no strategic reason for his lawyers not to investigate and present this new evidence.  He now offers new experts: Matthew Mendel, a psychologist; Albert Kittrell, the ADC clinical psychiatrist; Bhushan Agharkar, a psychiatrist; and Ruben Gur, a neuropsychologist.  Mendel diagnosed Springs with PTSD due to childhood trauma and described Springs as paranoid and delusional.  He concluded that the trauma has had "huge impacts" on his life, including playing a "significant role" in his killing Christina.  Doc. No. 181 at 202–03.  Kittrell believed Springs had a psychotic disorder when he examined him at the ADC in 2012 and 2015.  Agharkar interviewed Springs on five occasions, conducted several neurological screenings, and reviewed records.  He diagnosed Springs with schizoaffective disorder, PTSD, and minor neurocognitive disorder.  Gur reviewed Springs's brain scans and determined he had brain damage and dysfunction.

Kelley challenges the findings of these experts and contends they did not adequately explore the possibility that Springs was malingering.  She argues their conclusions were not informed by neuropsychological test results that would have made a difference:  During post-conviction proceedings in 2009, Springs underwent neuropsychological testing by Moneypenney. Additionally, prior to filing his habeas petition, Springs's habeas lawyer arranged for psychological testing by Dr. Dale Watson.  *In re: Thomas Leo Springs*, No. 4:12-MC-00007-JLH, Doc. Nos. 4 and 6; Pet'r's Ex. 20 at 339.  In 2015, Springs's habeas lawyer and Dr. Jonathan Lipman visited Springs and were permitted to bring pens, paper, and

36

a watch.  Pet'r's Ex. 20 at 265, 268.  The examiners were not called as witnesses at the evidentiary hearing.

Kelley's rebuttal experts could not evaluate Springs because he would not submit to an evaluation and refused to engage with them when they visited him.  Accordingly, an inference was drawn against Springs.  Had Kelley's rebuttal experts been given a meaningful opportunity to evaluate Springs, Kelley argues, they would have found he was not mentally ill at the time of the murder.

Kelley presented evidence that Joplin was an experienced, diligent defense lawyer.  The prosecutor, Tabor, testified that Joplin knew the strategies effective in Sebastian County jury trials.  Joplin had a good relationship with Tabor and was aware of his approach to trying cases. Kelley points to the conclusions of Deyoub and Diner, indicating that Springs was an angry domestic abuser.  She argues that those opinions reasonably closed the door on further investigation of a mental-illness defense.  She argues Springs's trial lawyers held back on presenting more mitigating evidence because they did not want to goad Tabor into putting on available evidence that Springs had a history of abusing Christina.  Kelley contends their decisions about how far to press their investigation and present mitigation evidence were based, in part, on Rule 18.2 and 18.3 of the Arkansas Rules of Criminal Procedure, which would have required the defense to turn over written mental-health evaluation reports to the prosecutor.

Kelley also argues much of the new evidence was not available to Springs's state-court lawyers.  She contends that, since 2005, changes in the Springs family and the passage of time

have affected the availability of new evidence and witnesses' willingness to come forward. Lorine is deceased, Springs's children are older and more mature, there is evidence the family's attitude has softened toward Springs, and there are now ADC records to review for signs of mental illness.

Addressing *Strickland* prejudice, Kelley argues that all evidence that would have been presented to the jury must be considered, not just the mitigation evidence that Springs would have presented. *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). If Springs had called mental illness or brain damage experts, he "would have opened the door to rebuttal by a state expert." *Cullen v. Pinholster*, 563 U.S. 170, 201 (2011). Tabor testified that, although he did not call Deyoub to testify, Deyoub was available in the event his testimony was needed to counter a defense mental-illness witness. Doc. No. 199 at 30. Tabor testified that the prosecutor's office investigated Springs's abuse of Christina and had evidence available to respond to the defense case. That evidence included witnesses to the abuse, underlying facts of the prior violent felonies introduced in aggravation, and the DHS order of protection hearing transcript and evidence. Tabor agreed the "good guy" testimony already opened the door, but presenting the domestic-abuse evidence only to respond to "good guy" testimony would have been an unnecessary risk. *Id.* at 53. Kelley also contends that—contrary to Springs's argument—presenting evidence of his family's criminal history would have been risky to the defense, possibly evoking the image that "the apple does not fall far from the tree." Doc. No. 186 at 72.

For the purpose of this order, it is assumed that Rosenzweig's work was constitutionally

deficient.   The key issue is therefore whether Springs's ineffectiveness-assistance-of-trial-counsel claims have "some merit."   *Martinez*, 566 U.S. at 14.   Springs has not demonstrated a substantial ineffectiveness claim related to his competency and guilt-phase points.   He has not shown his trial lawyers erred in relying on Deyoub's competency evaluation results.   He has not shown that, in light of overwhelming evidence of the elements of capital murder, a more thorough evaluation, a different expert, or a new diagnosis would have made a difference in the guilt phase.   For the sentencing phase, Springs has not demonstrated his trial lawyers' work was ineffective for accepting Springs's waiver of negative evidence about Christina.   The procedural default of the related claims, therefore, is not excused.

Springs's penalty phase  ineffectiveness claims are substantial if his lawyers "ignored pertinent avenues for investigation of which [they] should have been aware."   *Porter*, 558 U.S. at 40.   Springs's lawyers obtained his ProMed Cooper Clinic records.   They  interviewed his sister, Jannifer.   They also brought seventeen witnesses to "humanize" Springs by testifying to his helpfulness in the community and involvement with his children.   *See* Doc. No. 185 at 92–93; *Porter*, 558 U.S. at 41.   This is distinct from *Porter*, wherein penalty-phase counsel was deficient for failing to interview any of his client's family members or obtain any of his medical records.   *See Porter*, 558 U.S. at 43.   Further, while Springs's lawyers did not explore the reference in Deyoub's report to Springs's treatment at Charter Behavioral Health Hospital, those records would not have been a silver bullet.   For example, the attending psychiatrist reported that Springs had completed some college courses, that Springs's affect was appropriate, his recent and remote memory was intact, he was oriented to time, person, and

place, and he exhibited manipulative behavior.   Pet'r's Ex. 4 at 16–18, 31.   Springs's

appearance, speech, judgment, and insight were each categorized as "good" or "normal."   *Id.*

at 31. On an Evaluation of Risk to Self and Others form, under the "Homicide / Violence Risk

Factors" section, Springs reported that he was "afraid of what he might do."   *Id.* at 22. This

would have weighed against mitigation at the penalty phase.   Even if his lawyers had pursued

these records—coupled with the inference that Kelley's experts would have found that Springs

was not mentally ill when he murdered Christina—it is unlikely that "the result of the

proceeding would have been different."   *Porter*, 558 U.S. at 38–39 (quoting *Strickland*, 466

U.S. at 694).

      B.    <u>Brain Injury</u>

      Springs argues his state-court lawyers should have done more to investigate and present

evidence of a childhood brain injury.   Family members testified at the evidentiary hearing about

the head injury known to Springs's trial lawyers.   *See* Doc. No. 180 at 52–55, 153–56.   When

Springs was a young boy, he fell off the back of his father's truck and hit his head on the

bumper.   He was taken to the hospital by ambulance and received stitches across his forehead.

Based on neurological screening, Agharkar "strongly suspected damage in his frontal and

temporal lobes."   Doc. No. 182 at 83.   He diagnosed Springs with minor neurocognitive

disorder under the DSM-V.   He said that, under DSM-IV-TR language, in effect at the time of

Springs's trial, the term "cognitive disorder not otherwise specified" would have been used to

describe the same condition.   He said Springs's frontal-lobe damage affected his ability to

control his moods and impulses.   Agharkar testified that he did not believe that Springs was

malingering because he consistently missed screening questions related to the frontal and temporal lobes of the brain.  He said Springs could not have maintained a consistent presentation of feigned brain damage over his five interviews in six years.  Doc. No. 182 at 159.  Agharkar also said the screening results were confirmed by Gur's analysis of brain-imaging results.  Agharkar was not aware of Springs's previous neuropsychological testing, but agreed that Springs "should" undergo a neuropsychological battery.  *Id.* at 178.  He testified, however, that a neuropsychological test result showing no brain damage would not necessarily undermine his conclusions because he trusted the brain-imaging results.

Gur reviewed medical reports of MRI and positron emission tomography (PET) of Springs's brain.  An MRI shows brain structure or volume.  Gur analyzed whether a particular volume deviated from normal to the extent that the brain region was abnormal, or damaged.  A PET scan shows the metabolism within the brain, allowing assessment of brain function.  Gur concluded the most abnormal regions of Springs's brain were in the frontal lobe.  Gur determined the PET scan results showed moderately increased and decreased metabolism in various brain regions, demonstrating moderate to severe brain dysfunction.  He said this same analysis could have been done in 2005.

Gur explained that frontal lobe abnormalities indicate diminished executive functions, such as abstraction and mental flexibility, planning, moral judgment, impulse control, and emotional regulation.  *See* Doc. No. 183 at 35. Gur concluded Springs's brain dysfunction occurred in regions important for regulating emotion and behavior, causing hypervigilance, inappropriately high levels of cognitive control over emotion processing and experience, and

sudden hyperexcitability. *Id.* at 103.

Gur testified that13.6 percent of the population has clinically significant brain damage. He said about 27 percent of the population has some type of clinically significant brain dysfunction. He admitted that, because he had not examined Springs or reviewed any neuropsychological test results, he did not know the effect of his brain damage or dysfunction on his behavior or thinking. He could only say the abnormalities are likely to result in a particular behavior. He did not offer any opinions about Springs's state of mind when he killed Christina or whether he suffered from a mental disease or defect. He clarified that, if Springs has exhibited behaviors linked to frontal lobe or limbic system deficits, the brain damage or dysfunction that he observed in the neuroimaging could provide an explanation.

Agharkar was not convinced Springs's childhood head injury caused his brain damage. He said the damage could have been caused by untreated mental illness or been present since birth. He said there was a lack of data about the incident, and it was not clear if Springs lost consciousness. Doc. No. 182 at 86. The reporters were children at the time of the incident, and there are no medical records. Springs's family associated his stuttering with the incident, but Agharkar did not find a connection between the injury and the stuttering. The family story was that Springs had a plate in his head because of the fall, but Agharkar clarified that there is no plate. Gur, on the other hand, found the pattern of brain damage was consistent with a head injury to the left side of the brain. He determined Springs's brain damage and dysfunction is "very consistent" with his childhood head injury. Doc. No. 183 at 76–77.

Despite the findings of Agharkar and Gur, Springs's state-court lawyers were not

ineffective for the depth of their investigation of Springs's childhood brain injury. Joplin and Haaser did not refile their *ex parte* motion for appointment of an expert to determine possible effects of Springs's brain injury, after the trial court deemed the motion premature. They readily admit this was an oversight. They did, however, take additional steps after Deyoub submitted his evaluation. Not satisfied with Deyoub's finding of Springs as having an adjustment disorder with depressed mood, and in light of the absence of medical records from Good Samaritan Hospital, the lawyers secured funding to hire Diner. Diner informed the lawyers that Springs presented symptoms of depression. *See* Doc. No. 186 at 57. Diner conveyed to Joplin that Springs was angry and discussed his abuse of Christina. Given Springs's descriptions of the couple's fights and Springs's belief that she mistreated their children, Diner's impression was that the murder was "clearly premeditated." *Id*. at 56, 57. Diner did not believe that Springs had mental issues related to his brain injury, that would have risen to a legal defense. Sixteen years have passed since Springs's trial, and in the time since his sentencing, he has been extensively evaluated. Joplin and Haaser, however, were permitted to "draw a line when they [had] good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 382–83.

C.    <u>Traumatic Childhood</u>

Springs argues his state-court lawyers should have found more records and done a better job with witnesses to uncover a childhood dominated by violence and abuse. He contends trauma evidence would have supported a PTSD diagnosis and demonstrated an independent mitigating circumstance. A ruling was reserved on whether to consider Springs's traumatic

43

childhood as a separate category of mitigation evidence that his trial lawyers should have investigated and presented to the jury. Doc. No. 179 at 11–15. Upon review, Judge Holmes's order instructs that Springs's traumatic childhood should be considered part and parcel of Springs's PTSD argument, as opposed to considered in its own right. *See* Doc. No. 29 at 65–66.

Much of the lay-witness testimony at the evidentiary hearing was about Springs's mother, Lorine. While Springs's father, Thomas Springs, Sr., was considered a positive role model, Lorine was the dominant parent and had the greatest influence on their children. Springs was the oldest of his parents' three children, and Lorine had four children from an earlier relationship that lived in the home. Two cousins also lived with the family, after their mother, Ruby, was institutionalized. Family members testified at the evidentiary hearing, attempting to portray Lorine in a positive light.

Other testimony and criminal records paint a different picture of Lorine. That evidence demonstrates Lorine clearly was a destructive force in her children's lives. She taught her children that fighting and violence were the appropriate response to the slightest provocation. When Springs was twelve years old, a school social worker prophetically reported that Lorine "incite[d] her children to such an extent that they might kill someone some day." Pet'r's Ex. 33 at 58. The social worker emphasized that Lorine "ha[d] vicious attitudes toward policemen and people in authority." *Id.* Most of the new evidence involved Lorine's reaction to perceived attacks on her children. Her threats and violence were often directed against her children's teachers. Witnesses also testified that Lorine pointed, or shot, her gun at various people,

44

including her sons.  Thomas Charles Henry, a friend of Springs's brother, Willie, testified that, when he was fourteen years old, Lorine hid behind a garbage can, jumped out at him, and stuck a gun in his mouth, after he and Willie had an argument.

In December 1971, Lorine confronted Laverna's high school teacher and threw a chair down a stairwell, striking the teacher in the head and knocking her down.  The police report notes Lorine resisted arrest and inflicted cuts on the arresting officer's hand.  Lorine pled guilty to misdemeanor aggravated battery and received probation.  In January 1974, Lorine led her children in an attack on a police officer.  The officer had attempted to stop a motorcycle driven by Willie for a traffic violation; Willie refused to stop until he reached the Springs home.  Lorine and Willie repeatedly struck the officer, while another juvenile turned a hose on him.   While being transported to the police station after the melee, one of Lorine's daughters told police that Lorine "instructed all of her children to fight any police officer or school teacher who confronts them."  Pet'r's Ex. 33 at 56.  A jury found Lorine guilty of felony aggravated battery.  Her twelve-month sentence was commuted in lieu of probation, with the apparent condition that she leave Arizona and return to Arkansas.

Springs also presents evidence of emotional and physical abuse.  Witnesses testified Lorine regularly used extension cords and water hoses to whip her children.  Springs reported abuse in the Charter Behavioral Health Hospital records.  In his criminal records, Willie reported Lorine "beat him severely and then lock[ed] him in his room."  Pet'r's Ex. 50 at 341. Family members remembered Springs was teased for his stutter and head scar, and for attending the Jane Wayland School. He was called "Zipperhead" and "Herman Munster."  *See*

Doc. No. 180 at 324–26,153–55.

Springs was about twelve years old in 1974 when the Springs family relocated to Crossett, where Lorine continued to model violent behavior. Thomas Springs, Sr., and the two oldest children remained in Arizona. After a year in Crossett, the family moved to Fort Smith with a reputation as a "dangerous, treacherous family." Doc. No. 179 at 202. When Willie was being released from Arizona Department of Corrections Youth Center, a 1975 home-study report stated Lorine's Fort Smith home—where Springs lived—"was not good enough to send [Willie]." Pet'r's Ex. 50 at 339.

Mendel testified Springs's traumatic childhood experiences had a "huge impact" on him, including his killing Christina. Doc. No. 180 at 200–01. Mendel testified that, in killing Christina, Springs was modeling his mother's violent and irrational responses to perceived threats against her children. He said Springs's belief that Christina was abusing the children was influenced by his own childhood abuse. Mendel noted the "family pattern" of violent behavior, with Lorine's four sons all spending time in prison. Doc. No. 181 at 28–29.

Mendel gave Springs the Detailed Assessment of Post-Traumatic Syndrome (DAPS), a pencil-and-paper questionnaire used to diagnose or rule out PTSD, in 2013 and 2017. When Mendel administered the test in 2013, Springs listed killing Christina as his most traumatic lifetime event. In 2017, Mendel asked Springs to pick an earlier event, and Springs chose Lorine pointing a gun at him. DAPS tests for positive and negative bias, or malingering. Springs's scores showed negative bias, suggesting an invalid test result, based on his answers that he could read people's minds and had experienced the sudden loss of the ability to read.

Mendel chose to accept the results because he believed Springs was answering truthfully, based on his delusions and because his reported symptoms of paranoia were consistent with how family members described him.  Mendel said that in both the 2013 and 2017 tests, Springs's responses endorsed the requisite PTSD symptoms—re-experiencing, avoidance, and hyperarousal—"well beyond the clinical cutoff" and were "indicative of extreme [PTSD]."  Doc. No. 181 at 62.  Mendel also gave the Clinician-Administered Post Traumatic Scale (CAPS), a structured interview to explore possible PTSD symptoms in 2017.  When asked to reflect, Springs said he was most bothered by antecedent trauma in the month prior to killing Christina.  He said that he was having "frequent images and recollections of the physical abuse by his mother" and "even confusion of his mother and [Christina]."  Doc. No. 181 at 67.  Mendel determined Springs had PTSD in 2005 when he killed Christina, and in 2013 and 2017, and that PTSD contributed to Springs killing her.  Springs said any time Christina was harsh with the children, he immediately remembered his mother and pictured her pointing a gun in his face.  Mendel explained that re-experiencing led to psycho-physiological hyperarousal.  He said that, during the month that Christina left with the children, Springs was distressed because he was not there to protect them from someone that he considered abusive and dangerous.  Mendel said his testimony could also give context to prior offenses introduced in aggravation and could have contextualized evidence of domestic abuse, if it had been introduced.

Agharkar also diagnosed Springs with PTSD.  He said the disorder required (1) a major life trauma, and (2) as a result, reexperiencing of symptoms, typically nightmares, flashbacks,

47

hypervigilance, and avoidance symptoms.  He said Springs met that criteria.  Agharkar, however, did not believe Springs's PTSD "necessarily play[ed] a role in the crime itself."  Doc. No. 182 at 885.

Kelley admits Springs was raised in a violent family with a "spare the rod" mentality. She notes, however, that, when Springs murdered his wife, he was 42 years old with seven children.  She argues that, under those circumstances, evidence about a difficult childhood is not particularly mitigating.  She also contends evidence of Springs's childhood abuse is less troubling than the child-abuse evidence found mitigating in *Porter v. McCollum*, 558 U.S. 20, 33 (2009) (petitioner "was his father's favorite target" and "routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child"), *Wiggins v. Smith*, 539 U.S. 510, 534–35 (2003) (poverty, neglect,  "physical torment, sexual molestation, and repeated rape"), and *Rompilla v. Beard*, 545 U.S. 374, 391–92 (2005) (petitioner "lived in terror").  Kelley is correct that there was no witness testimony or record evidence of extreme, unrelenting physical or sexual abuse, or poverty and neglect.  Most of the witness testimony detailed the abuse of other family members.  Kelly also notes Springs's reaction to witness testimony about his troubled family at the habeas evidentiary hearing.  *See* Doc. No. 126.  She argues the jury would not have heard childhood-abuse evidence because Springs would have responded similarly at trial, especially in light of Springs's trial-court reaction to proposed negative evidence about Christina and his reluctance to share any childhood-abuse history with his trial lawyers.  Haaser testified that, even if the lawyers had uncovered the childhood-trauma evidence, he did not think Springs would have permitted them

48

to introduce it.  *See* Doc. No. 184 at 83.

Springs's state-court lawyers' performance as to Springs's traumatic childhood was not deficient.  "Counsel's actions are [] based, quite properly, on . . . information supplied by the defendant."  *Strickland*, 466 U.S. at 691.  Evidentiary hearing testimony clearly supports that Springs grew up in a lawless household.  Lorine was violent and volatile [volatile], both toward her children and perceived threats against them.  Given Springs's denial of his childhood trauma and refusal to discuss it in preparation for trial, however, *see* Doc. No. 184 at 81, it was not possible for his lawyers to use traumatic-childhood evidence to support a PTSD argument. Joplin was a "good listener," he met with Springs at least once a week, and Springs trusted him. *Id*. at 79.  Still, despite their relationship, Springs was unwilling to expose the abuse of his childhood.  *Id.* at 81.  When Joplin asked Springs outright whether he had been abused as a child, Springs responded that he did not want to "tell on" his mother.  Doc. No. 185 at 38–39. Springs's sister, Jannifer, was not any more helpful.  *See* Doc. No. 184 at 79.  Haaser and Joplin concede that they failed to obtain Springs's Charter Behavior Health records, after receiving Deyoub's report.  *See id.* at 45.  Considering that neither Springs nor his family would discuss his childhood, coupled with the fact that Deyoub did not flag the records as particularly important, Haaser and Joplin's advocacy fell within the "wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.

D.   Mental Illness

Springs argues that his state-court lawyers' work was constitutionally ineffective for failing to investigate and present evidence of his mental illness.  Evidentiary hearing witnesses

described mental-illness signs and symptoms that, Springs says, his trial lawyers should have uncovered and further investigated. For instance, Springs attended the Jane Wayland School, described as a school for children with "emotional disorders," during the third through fifth grades. Pet'r's Exs. 45, 46, 47, 85. Two of Springs's children, Jacob and Matthew, testified that although they had positive memories of their father, they also were aware that he suffered from mental illness. Doc. No. 180 at 362–65, 391–92. They remembered his paranoia and insistence that he received instructions from God. They now realize that he slept a lot and isolated himself because he was depressed. Matthew testified that Springs had two kinds of bad days: secluding himself in his bedroom or having explosive reactions. Matthew remembered Springs accusing Christina of having an affair if she was a few minutes late. Greg Canady, a pastor and friend of Springs, testified that shortly before the murder, Springs told him that he received direct messages from God. Doc. No. 179 at 215–218. Springs told Canady that he could forecast the future and read minds. Canady saw Springs two days before the murder and said Springs did not look like himself. Canady testified at trial and said the trial lawyers did not ask him about Springs's mental state. Springs's direct-appeal lawyer, Taylor, testified that he "pretty quickly formed the impression" that Springs was mentally ill. Doc. No. 183 at 166–67.

Springs also presented evidence that he exhibited mental-illness symptoms after he was sentenced and imprisoned. Julia Partain, the ADC social worker assigned to Springs's cell block, testified from her notes. She worked with Springs, beginning in 2009 or 2010, for five years. During that time, she recorded signs of manic episodes, paranoia, hallucinations, and

depression.  She referred Springs to the staff psychologist several times.  In February 2015, after Springs was taking the antipsychotic medicine Risperidone, he told Partain that the medicine was having some effect.  Partain's notes reflect that, by March and April 2015, Springs had adjusted to his medications, and they were "most definitely" helping him.  Doc. No. 182 at 35.

Dr. Kittrell evaluated Springs at the Varner Unit in May 2012.  *See* Doc. No. 181 at 229.  He recorded possible religious delusions and hallucinations.  Kittrell determined that Springs's belief in prophetic insight showed grandiosity and a delusional thought pattern. Kittrell made a rule-out diagnosis of psychotic disorder.  He recommended antipsychotic medication, but Springs refused it.  Kittrell saw Springs again in 2015, and he reported a "recent history of auditory/visual hallucinations."  Doc. No. 181 at 758.  Kittrell added a rule-out diagnosis of antisocial personality disorder.  Kelley challenged Kittrell's diagnosis as being based primarily on Springs's self-reporting.  She argues that evidence about Springs's behaviors while imprisoned in the ADC was not available to trial lawyers.

Agharkar diagnosed Springs with schizoaffective disorder—schizophrenia and depression or bipolar.  Doc. No. 182 at 61.  In addition to the neurological screening and interviews of Springs, Agharkar considered Springs's family history of mental illness, his enrollment in the Jane Wayland School, and his Charter Behavioral Health Hospital records. Agharkar also relied, in part, on the ADC records unavailable to state-court lawyers.

Agharkar testified that he observed signs of psychosis early on.  Springs told Agharkar that he almost did not meet with him because he dreamt about eating raw chicken.  Springs

51

interpreted the dream to mean that Agharkar did not have "true intentions" and was "out to get him" because raw chicken is not real food. *Id.* at 65–66. Agharkar described other signs of psychosis, including hallucinations and paranoia. Agharkar testified that Springs heard voices, including the voice of God, and believed he received special messages that allowed him to predict future events. He explained that Springs's hyperreligious delusions were signs of mental illness, rather than the beliefs of a spiritual person. Agharkar described Springs as "consumed" by his dreams and their meaning. *Id.* at 72.

Agharkar explained that, to be diagnosed with schizophrenia, a person must demonstrate two of the five symptoms over a six-month period: hallucinations, delusions, disorganized speech, disorganized behaviors, and negative symptoms like flat affect, restrictive range of affect, difficulties with motivation. He observed Springs exhibiting hallucinations, delusions, and disorganized thinking. He also saw significant depression in the records extending before the crime. Agharkar did not gather a history of mania prior to the murder. He saw a record of at least two manic episodes, based on Partain's notes, and the murder was the third episode. Agharkar described a manic episode as a one-week period of extremely elevated mood. Springs was hyperverbal, not sleeping, grandiose, irritable, and possibly hypersexual. Agharkar said a person has to experience only one manic episode to be diagnosed as bipolar. Springs was not taking medication at the time of any interviews with Agharkar. Springs told Agharkar that, when he was taking prescribed antipsychotic medication, his concentration was better, his thoughts were more organized, and his moods were more even. Agharkar testified that Springs's description of the medicine's effects was what he would expect for someone with

52

Springs's mental illness and is further confirmation of his diagnosis.

Agharkar found that Springs was unable to conform his conduct to the requirements of the law at the time of the crime due to mental disease or defect. Doc. No. 182 at 60–61. He determined that Springs has a major mental illness and brain damage that would constitute mitigating circumstances. Agharkar believed that Springs's psychosis made him irrational and paranoid, preventing him from deliberating and weighing properly. Agharkar had "serious concerns" about Springs's competency to stand trial, but he did not have sufficient information about Springs's condition at the time of trial to form an opinion. Doc. *Id.* at 60.

Agharkar described Springs as becoming increasingly paranoid in the weeks leading up to the murder. He said the stress of Christina leaving with the children may have caused an exacerbation of symptoms. Springs reported hearing voices telling him that she was going to hurt the children. He told Agharkar that he had started taking Effexor, the antidepressant medication prescribed at the ProMed Cooper Clinic, and it made him feel unlike himself. Agharkar said an antidepressant was "exactly" the wrong medicine for Springs, and that antidepressants are well-known to potentially cause a "manic switch" that can switch a person with a bipolar diagnosis into a mania. Doc. No. 182 at 109–10. According to Agharkar, the errantly-prescribed antidepressant contributed to Springs's adverse mood state "akin to gasoline on a fire." *Id.* at 112. Witness accounts of the murder informed Agharkar's opinion as to whether Springs was suffering from a mental disease or defect when he killed Christina. Witnesses saw Springs smash car windows, jump up and down on the windshield, and persist even after getting hit by a truck. Agharkar admitted Springs may have been simply angry that

53

his wife left him.  He believed the crime circumstances, however, pointed to manic behavior: Springs murdered Christina in the middle of the day at a busy intersection, and he did not try to escape.

Agharkar also challenged Springs's pretrial and post-conviction mental evaluations.  He testified Deyoub did not have the necessary background material.   He said Diner's observations—that Springs was tangential, repetitive, grandiose—are possible indicators of a thought disorder.  Agharkar said Gale's strong provisional diagnosis aligns with his diagnosis.  Doc. No. 182 at 119–20.  He said  Moneypenney's test results, which showed the same IQ score split as Deyoub's testing and mild brain damage, required follow-up.  He said that, if he had seen these results, he would have recommended a brain scan.

Springs undoubtedly suffered from depression at the time he killed Christina, and he had for years.  Various assessments of Springs—which span the years before and after his murder of Christina—echo one another.  His poor mental health was quickly apparent to Joplin, who noted in their first meeting that something about Springs "look[ed] like emotional disturbance." Doc. No. 185 at 36.  Springs told Deyoub that he had been treated for depression and had received special education.  Pet'r's Ex. 16 at 3, 5.  Deyoub wrote that "at the time of [his] examination, [Springs] was depressed, given his circumstances."  *Id.* at 7.   Deyoub concluded that Springs had "no psychosis and no mental disorder, and emotions of anger and rage do not constitute a mental disease or inability to conform one's conduct to the requirements of the law." *Id*. at 8.  Springs's Charter records, referenced in Deyoub's report, largely mirror Deyoub's findings.  While at Charter, which was seven years before he killed

Christina, Springs reported that he was "afraid of what [he] might do if he [found] her." Pet'r's Ex. 4 at 52. Springs was noted to have suicidal ideation and depression, which was exacerbated by his family relationships. *Id.* at 7, 14, 19, 48. Psychosis and schizophrenia were specifically not noted as presenting problems, s*ee id.* at 7, but the "criteria for significant PTSD [were] present." *Id.* at 64. As Agharkar testified, however, Springs's PTSD did not "necessarily play[] a role in the crime itself." Doc. No. 182 at 112. These evaluations, taken with the adverse inference against him, *see* Doc. No. 126, prevent a finding of *Strickland* prejudice as to Springs's mental illness claims.

> ### E.   Failure to Call Chantelle Mooring as a Mitigation Witness

Springs argues that his trial lawyers were constitutionally ineffective for not interviewing and calling his older children—Joshua, Matthew, and Chantelle—as mitigation witnesses. The three read from prepared statements after the jury reached a sentencing decision, but before the trial judge imposed the death sentence. Each talked about their positive memories of Christina and their love for Springs. Chantelle stated that she forgave Springs and did not hate him.

Rosenzweig raised the habeas claim as to Matthew and Chantelle in the Rule 37 petition. Matthew testified at the Rule 37 hearing that, if Springs's trial lawyers had contacted him, he would have testified on his father's behalf. Chantelle did not testify at the Rule 37 hearing. Springs alleges in his habeas petition that he opposed calling Chantelle as a witness because, on the eve of the Rule 37 hearing, he dreamed of President Obama's dog, Bo, and believed the dream to be a message that his daughter would humiliate him at the hearing. Doc.

No. 1 at 41.  The circuit court denied Rule 37 relief as to both Matthew and Chantelle.  On appeal, Springs argued that finding was in error as to Matthew.  The Arkansas Supreme Court affirmed, holding Springs's trial lawyers' work was constitutionally ineffective but that Springs failed to demonstrate a reasonable probability that Matthew's testimony would have altered the sentencing verdict.

It was determined the Arkansas Supreme Court's decision as to Matthew was not unreasonable and that Springs was not entitled to habeas relief on that point.  Doc. No. 29 at 27–45.  It was found that Joshua's statement had little mitigating value, and the procedural default of the claim as to him was not excused under the *Martinez-Trevino* equitable exception.  Doc. No. 29 at 68 n.19.  It was determined that issues related to Chantelle would be heard at the evidentiary hearing because the failure to call her as a mitigation witness  at the Rule 37 hearing related to potential mitigation evidence and to Springs's mental condition.  *Id.* at 68.

Prior to the evidentiary hearing, Springs moved to exclude evidence of unsubstantiated allegations in April 2004 that he had sexually abused Chantelle.  He argued that evidence would not have been admissible at trial.  Kelley responded that she was not trying to demonstrate the truth of those allegations, only that Springs's trial lawyers considered that evidence in deciding whether to call Chantelle as a mitigation witness.  Springs's motion was denied.

Chantelle's abuse allegations against Springs, along with the finding that they were unsubstantiated, were included in the DHS records that Joplin was allowed access to before trial.  At the evidentiary hearing, Joplin could not specifically remember the allegations.  He

testified that, if the allegations were part of the DHS records, he would have considered them. Based on the allegations, he would have been afraid to call Chantelle as a witness. Joplin also remembered reading letters that Chantelle had written to Springs. He testified that he considered the contents of those letters in his decision not to call her as a mitigation witness. Joplin interviewed a witness who told him that the allegations were false, and that a child therapist told him that Chantelle did not want Springs to be sentenced to death. Rosenzweig testified that he did not call Chantelle as a witness at the Rule 37 hearing because of her allegations of sexual abuse against Springs.

Springs's lawyers considered Chantelle's allegations of sexual abuse, during both trial and post-conviction proceedings. The decision not to call her as a mitigation witness was part of a reasonable trial strategy. The defaulted ineffectiveness claim is not substantial, and procedural default is not excused.

F.    Related Prosecutorial Misconduct Claims

In a defaulted prosecutorial misconduct claim, Springs alleges the prosecutor withheld information material to a mental-illness defense, including his 1988 suicide attempts while in police custody; suicide watch during pretrial detention; treatment for anxiety and depression during pretrial detention; family history of mental illness in police, jail, prosecutor, and court records; and the criminal history records of Springs's family members. That evidence does not meet the *Brady* materiality standard. *See Banks v. Dretke*, 540 U.S. 668, 698–99 (2004); *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Springs has not demonstrated "the favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  The procedural default therefore is not excused.

    G.    <u>Actual Innocence</u>

    Springs argues that he is actually innocent of capital murder because (1) his mental illness prevented him from forming the mental state to commit capital murder, and (2) he was insane at the time that he killed Christina.  He contends that he is actually innocent of the death penalty because (1) his mental illness prevented him from forming the mental state necessary for two of the three aggravating circumstances, and (2) no reasonable juror would have found the death penalty was an appropriate punishment.

    The fundamental miscarriage of justice exception to procedural default requires that Springs (1) present "new reliable evidence" not introduced at trial, and (2) demonstrate that, in light of the new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 324, 326–27 (1995).  To be actually innocent of the death penalty, Springs must "show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992); *see Wooten*, 578 F.3d at 781.  Springs has not demonstrated that the new evidence was not available at trial or could not have been discovered with due diligence. *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). He has not shown that he could not form the premeditation or deliberation required to commit capital murder. *Jones v. Delo*, 56 F.3d 878, 883 (8th Cir. 1995).  He has not demonstrated that no reasonable juror would have found him eligible for the death penalty.

*Sawyer*, 505 U.S. at 347; *Wooten*, 578 F.3d at 781.  Springs's actual innocence argument therefore fails both as a freestanding claim and a gateway claim.

## V. CERTIFICATE OF APPEALABILITY

A certificate of appealability is granted on the claim of ineffectiveness for failure to call Matthew Mooring as a mitigation witness.

## VI. CONCLUSION

For the forgoing reasons, Springs's petition for a writ of habeas corpus [Doc. No. 1] is denied.

IT IS SO ORDERED this 19th day of August, 2021.

_____
UNITED STATES DISTRICT JUDGE